### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENNY E. KRIESCH<br>2702 Muskogee Street<br>Adelphi, MD 20783,<br><br>     Plaintiff,<br><br>  v.<br><br>MICHAEL O. JOHANNS<br>SECRETARY OF AGRICULTURE,<br>U.S. Department of Agriculture<br>Whitten Building, Room 200A<br>1400 Independence Ave., S.W.<br>Washington, DC 20250-0100,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-02402 (RMC)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### FIRST AMENDED COMPLAINT

1.    Plaintiff Penny E. Kriesch, by and through undersigned counsel, hereby files this First Amended Complaint against Defendant Michael O. Johanns, Secretary of Agriculture, in his official capacity only, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and seeks relief pursuant to Title VII and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, for harms caused to Plaintiff by Defendant's unlawful race discrimination and retaliation against her.  Plaintiff requests as relief: an immediate retroactive promotion to a GS-14 position for the period August 1999 to June 2003, with full back pay and benefits, including interest, maximum compensatory damages, declaratory and injunctive relief, and attorney fees, costs, and expenses, in order to remedy Defendant's unlawful acts.

## PARTIES

2.    Plaintiff Penny E. Kriesch, a United States citizen, is a federal employee with over 26 years of government service, who has dedicated her last 16 years to the United States Department of the Agriculture ("USDA") Animal and Plant Health Service ("APHIS").    She resides at 2702 Muskogee Street, Adelphi, MD 20783.  Ms. Kriesch is African American.

3.    Defendant Michael O. Johanns is Secretary of Agriculture and the head of the USDA, and as such, has ultimate authority over the actions of APHIS.  Defendant is sued in his official capacity only.  His address is 1400 Independence Ave., S.W., Washington, DC 20250.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this Complaint because it presents a question of federal law. 28 U.S.C. § 1331.

5.    Specifically, this Court has jurisdiction over this Complaint pursuant to 42 U.S.C. §§ 2000e-5(f)(3), 2000e-16(d), and 1981a.

6.    This Court is the proper venue pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).  The majority of the discriminatory acts took place in the District of Columbia.

7.    The facts underlying Ms. Kriesch's Complaint were developed, in part, through administrative Equal Employment Opportunity ("EEO") complaints which she timely initiated and has fully exhausted.

8.   Ms. Kriesch timely initiated contact with Defendant's Civil Rights Office regarding her claims of discrimination and hostile work environment on March 22, 1999, and again on May 4, 1999 (Agency Case No. 990793), on September 26, 1999 (Agency Case No. 000170), and again on August 24, 2000 (Agency Case No. 010053).   She timely filed formal discrimination complaints regarding these claims on July 2, 1999, November 10, 1999, and October 18, 2000, respectively.   Plaintiff's complaints were consolidated for investigation on March 5, 2001, and amended on July 13, 2001; and Defendant then completed a Report of Invest-igation ("ROI") on Plaintiff's formal discrimination complaints. After completing its ROI, Defendant issued a letter to Ms. Kriesch authorizing her to request a hearing at the Equal Employment Opportunity Commission ("EEOC"), which she timely did (EEOC No. 100-A2-9729X).   On December 23, 2004, the EEOC issued an Order of Dismissal, which Ms. Kriesch timely appealed to the EEOC Office of Federal Operations ("OFO") on January 21, 2005 (Appeal No. 01A52321).   The OFO claims to have issued a decision denying Ms. Kriesch's appeal on June 16, 2005, but she never received this decision (a FOIA request is pending at the EEOC) and, to date, Defendant has not issued a Final Agency Decision ("FAD") on these complaints.   Plaintiff filed her initial Complaint more than 180 days after filing her formal EEO complaints. See 42 U.S.C. § 2000e-16(c).

9.   Ms. Kriesch timely initiated contact with Defendant's

Civil Rights Office on July 19, 2001, regarding her claim of retaliation (Agency Case No. 020011), and she was notified of her right to file a formal discrimination complaint on September 28, 2001.  Ms. Kriesch then timely filed her formal discrimination complaint on October 2, 2001, which Defendant accepted for investigation on May 30, 2002.  After completing its ROI, Defendant authorized Ms. Kriesch her to request an EEOC hearing, which she timely did (Hearing No. 120-2003-00221X).  On December 16, 2003, following a hearing, the EEOC issued an Order Entering Judgment in favor of Defendant, and on March 18, 2004, Defendant issued its FAD, which Ms. Kriesch timely appealed to the OFO on April 16, 2004 (Appeal No. 01A43314).  On June 3, 2005, the OFO issued a decision denying her appeal, and Ms. Kriesch timely requested reconsideration of that decision (Request No. 05A51017).  On September 12, 2005, the OFO issued a denial of Ms. Kriesch's request for reconsideration, which she received on September 15, 2005.  Plaintiff filed her initial Complaint within 90 days after receiving that decision.

## FACTS

10. Ms. Kriesch is a highly qualified, well-educated federal employee.  She has a Bachelor of Arts (B.A.) degree, *cum laude*, from Trinity College, Washington, DC, where she had a triple major in Early, Elementary, and Special Education (1978). Ms. Kriesch was enrolled in an Honors Program at Trinity College and studied History, English, and Political Science abroad at

Oxford University (1976).  She earned a Masters in Science (M.S.) Degree, *cum laude*, in Organization Development/Human Resources from American University (1993).  Ms. Kriesch's award-winning Masters thesis was on Strategic Development, and she has been involved in strategic planning work since 1984.

11.  Ms. Kriesch, who began working for the federal government in 1979, has devoted 27 years of service to the federal government, including 17 years with the USDA at APHIS. Between 1998 and the date of the retaliatory non-selection at issue in her final EEO complaint on July 12, 2005, <u>see</u> ¶¶ 9, 94-120, Ms. Kriesch served as a GS-13 Program/Management Analyst, during which time she earned a series of commendations and awards.  In June 2003, almost two full years after Defendant denied her the GS-14 selection that underlies her last EEO complaint, Ms. Kriesch was finally promoted to GS-14.

12.  Throughout her lengthy career, Ms. Kriesch has been responsible for successfully completing many high profile projects for the USDA.  Ms. Kriesch designed the strategic planning systems and subsystems used throughout APHIS Plant Protection and Quarantine ("PPQ"), and she was part of an inter-national team involved in strategic planning with the Embassy of Ghana.  During her tenure with APHIS, Ms. Kriesch served as a PPQ internal strategic planner and as an oft-requested strategic planning expert for Department-level activities.  Ms. Kriesch was also responsible for teaching USDA personnel about

project management and results-based management.

13. At the time of the retaliatory non-selection to GS-14 at issue in her final EEO complaint, Ms. Kriesch had almost 22 years of professional experience and nearly 14 years of service as the GS-13 level. While serving as a GS-13, and throughout her tenure as a federal employee, Ms. Kriesch has excelled in the performance of her duties, as evidenced by the fact that she had received twenty-six (26) awards for the quality of her work.

14. Ms. Kriesch is currently employed by APHIS as a GS-14 Management Analyst, having served in this position since June 2004. Previously, Ms. Kriesch served in various GS-13 non-supervisory positions at APHIS, primarily in the areas of human resources, strategic planning, and communications from July 1989 to June 2004. Prior to working at APHIS, she worked at the Food and Drug Administration ("FDA") for six years from September 1985 to July 1989. In her last position at FDA, she was a GS-13 Supervisory Personnel Management Specialist for almost two years (August 1987 to July 1989). Previously, she had worked at the Naval Surface Weapons Center, U.S. Department of the Navy, from January 1984 to September 1985, and earlier at the Defense Logistics Agency from August 1979 to January 1984.

15. Ms. Kriesch was discriminated against on the basis of her race and/or retaliation for filing EEO complaints and/or opposing discriminatory practices as set forth below in paragraphs 16-120.

_____

16. Ms. Kriesh was discriminated and retaliated against when, between 1997 and 1999, her supervisors, including Charles P. Schwalbe, Ph.D (white), Associate Deputy Administrator for PPQ, refused to issue her a performance appraisal, which prevented her from receiving cash awards.

17. In 1997, Ms. Kriesch was working as a Communications Manager, and despite her repeated requests, her first-line supervisor, Dr. Schwalbe, refused to issue her a performance appraisal. In 1998, while Dr. Schwalbe was on an extended detail, Ms. Kriesch was temporarily assigned to a series of rotating supervisors, including Paul R. Eggert (white), former Assistant Deputy Administrator; none of the temporary supervisors issued her a performance appraisal. Thus, she asked her second-level supervisor, Alfred S. Elder (white), former Acting Deputy Administrator for PPQ, to provide her with a performance appraisal, but he refused to do so, and instructed her to wait for Dr. Schwalbe to issue her one after his detail concluded. Dr. Schwalbe resumed his role as Ms. Kriesch's supervisor in 1999, and for the third consecutive year he refused to issue her a performance appraisal.

18. Dr. Schwalbe claimed, on pretext, that Ms. Kriesch was not issued a performance appraisal for three years because her position did not have performance standards and thus he could not assess her work. However, the position Ms. Kriesch

occupied, Position Description No. 000RV112, was established in 1996, and Dr. Schwalbe took no meaningful steps to promulgate the position's performance standards while Ms. Kriesch was serving in the position.  As stated by Mr. Elder, Defendant's failure to give Ms. Kriesch performance standards placed her in the difficult position of meeting expectations of which she was not aware.

19.  Between 1997 and 1999, and on her own initiative, Ms. Kriesch provided Dr. Schwalbe with drafts of proposed performance standards and made several requests to meet with him regarding the standards, which he disregarded.  Dr. Schwalbe repeatedly promised to meet with Ms. Kriesch to "talk about" the performance standards, but continually failed to do so, and he never finalized them or submitted them to Mr. Elder for approval.  By 1999, Ms. Kriesch realized Dr. Schwalbe had no intention of completing her performance standards or issuing her a performance appraisal.

20.  While working with Dr. Schwalbe, Ms. Kriesch heard him make several derogatory and racially hostile comments about African Americans.  In 1997, he referred to former APHIS Administrator Terry L. Medley (African American), as a "Black Bug." In or around May 1999, during a conversation with Ms. Kriesch and Lydia P. Monroe (African American), a PPQ office automation clerk, Dr. Schwalbe told Ms. Monroe to ask her mother wether it was true that "a spade is a spade".  Later that year, prior to

8

an all-employee staff meeting, Dr. Schwalbe said it was "getting spooky in here" when Jean Gill (African American) walked into the room, and later said he did not "like being spooked" after Ms. Gill asked him a question during the meeting.

21. Dr. Schwalbe, Mr. Elder, and Ms. Kriesch's other supervisors all knew she was African American, and by at least October 1997, Dr. Schwalbe knew about her prior discrimination complaint. <u>See</u> <u>infra</u> at ¶¶ 26-32.

22. Between 1997 and 1999, Dr. Schwalbe's other subordinates, all of whom were white, were working under established performance standards. Thus, each of them was eligible for, and on information and belief received, cash awards during that period. Because Defendant refused to properly complete Ms. Kriesch's performance standards and issue her a performance appraisal, she was denied opportunities to compete for such awards.

23. In 2000, after Ms. Kriesch's filed her formal discrimination complaint, Dr. Schwalbe asked her to sign and backdate a document that purported to be the performance standards for the Communications Manager position she had held since 1996.

24. Ms. Kriesch was discriminated and retaliated against when, in December 1997, Dr. Schwalbe relocated her from her office in Defendant's Whitten Administration Building to its South Building in direct proximity to John Good (white), then-

supervisor of Defendant's Human Resources Systems Design Office.
Mr. Good was Ms. Kriesch's former supervisor and was previously
terminated by Defendant for sexually assaulting her and intim-
ating that he intended to have sex with her then-12-year-old
daughter.  This relocation was not only abusive, but also made
it more difficult for Ms. Kriesch to effectively perform the
duties of her position.

25.  In 1989, Ms. Kriesch had filed and prevailed in a
discrimination complaint against Mr. Good after he sexually
assaulted her, spoke intimately about her daughter, and referred
to Ms. Kriesch as a "kinky-headed, half-breed bitch" ("EEO
Complaint One").  Defendant terminated Mr. Good in 1990.  Unbe-
knownst to Ms. Kriesch, Defendant subsequently rehired Mr. Good,
and Dr. Schwalbe relocated Ms. Kriesch to work in the South
Building, only four doors away from Mr. Good's office.

26.  In 1997, Dr. Schwalbe met privately with Ms. Kriesch
and expressed his extreme displeasure concerning her involvement
in EEO Complaint One.  Dr. Schwalbe had worked closely with Mr.
Good in the 1980's, and told Ms. Kriesch he could not believe
she was "one of the women involved in that ... mess."  Dr.
Schwalbe's words and demeanor made it clear to Ms. Kriesch that
he was personally offended by her protected civil rights
activities.

27.  Prior to and throughout 1997, general awareness of Ms.
Kriesch's previous protected EEO activities, including EEO

Complaint One, substantially increased among her colleagues and supervisors.

28.  Between 1996 and 1997, USDA conducted a series of meetings ("Listening Sessions") concerning discrimination within the Department and subsequently released a report regarding such issues entitled "Civil Rights at the United States Department of Agriculture — A Report by the Civil Rights Action Team." During one Listening Session, Karin Leperi, a white APHIS employee, publicly identified Ms. Kriesch as one of three women who had been previously involved in a discrimination complaint against the Department (EEO Complaint One).  The Action Team Report mentioned her prior complaint.

29.  In 1997, Ms. Kriesch also became an active, dues-paying member of the USDA Coalition of Minority Employees ("Coalition"), an organization that has as its stated purpose: "the eradication of all forms of discrimination and to serve as the conscience of USDA." See www.agcoalition.org.  Ms. Kriesch is a State Chapter Representative and has been actively involved in several high-profile actions taken by the Coalition, including many events that took place between April and December 1997, as well as later events involving the White House, Congress, and the Secretary of Agriculture.  Ms. Kriesch helped write the Coalition's USDA Civil Rights strategic plan, which was adopted by former Secretary of Agriculture, Ann M. Veneman.

30.  Ms. Kriesch subsequently served as the APHIS

representative on the National Civil Rights Leadership Committee and served as a Class Sub-Agent in <u>Spencer, et al., v. USDA</u>, (EEOC No. 370-2004- 00241X), a long-running administrative class action case at the EEOC, which was filed on February 5, 1999.

31.  In November 1997, after the meeting referenced in paragraph 26, Dr. Schwalbe informed Ms. Kriesch that she was being relocated to the South Building, effective December 1997. (Due to renovations in the South Building, Ms. Kriesch did not begin working there until February 1998).

32.  When Dr. Schwalbe relocated Ms. Kriesch, he knew about EEO Complaint One and that the assignment would place her in close proximity to Mr. Good's office.  In February 1998, after Ms. Kriesch discovered she had been assigned to work so closely to Mr. Good, she immediately contacted Dr. Schwalbe and asked for an emergency meeting to discuss her relocation.  When they met, Dr. Schwalbe told Ms. Kriesch that he had considered her prior EEO interactions with Mr. Good when he decided to move her, but thought it would be fine to relocate her because he did not believe the allegations she had previously asserted against Mr. Good in EEO Complaint One.

33.  After she was relocated to the South Building, Mr. Good began harassing and intimidating Ms. Kriesch.  He routinely stood outside her office for no apparent reason, banged a coffee pot against the window of her office door, and stood in the doorway of the men's lavatory when she passed by and gestured

as if he were inviting her to enter.

34.    Ms. Kriesch's relocation to the South Building made it more difficult for her to complete her duties as a Communications Manager.  She was responsible for coordinating Defendant's rapid responses to various information requests and correspondences, and the people and tools she needed to accomplish this were located in the Whitten Administration Building, including the relevant phone/fax systems and individuals in the Offices of the Secretary of Agriculture and the APHIS Administrator. Ms. Kriesch had to travel between the two buildings 3 to 4 times a day to effectively perform her job.

35.    Ms. Kriesch repeatedly renewed her request to Dr. Schwalbe to be relocated to an office away from Mr. Good, but he refused to honor her request and even suggested that she "quit" in order to resolve the problem.  She also raised the issue with and made the same request of multiple APHIS and USDA officials, including Mr. Elder, Mona A. Grupp (white), PPQ Program Liaison Officer, and George S. Robertson (white), the Workplace Violence Administrator, as well as the newly appointed APHIS Administrator, Craig A. Reed (white).

36.    Ms. Kriesch consistently noted that her relocation to the South Building was discriminatory and elicited the aid of Anna P. Grayson, Director of APHIS' EEO Office, to address her concerns.  However, Ms. Grayson told Ms. Kriesch she could not file an EEO complaint and referred her to Sheila Clemons, who

coordinated the USDA's ADR activities, who in turn required that she meet with Dr. Schwalbe to address the relocation. Dr. Schwalbe refused to move her, and none of Defendant's managers took any meaningful steps to respond to Ms. Kriesch's concerns until after she filed her second EEO complaint on May 4, 1999 (Agency Case No. 990793).

37. Dr. Schwalbe claimed, on pretext, that Ms. Kriesch was moved to the South Building because her office in the Whitten Building was being converted into a conference room and the South Building had the only available space in which she could work. However, there was a vacant office adjacent to Ms. Kriesch's previous work area in the Whitten Building that Dr. Schwalbe's staff regularly used for miscellaneous projects, and Ms. Kriesch offered several times to move into that space. With no explanation, Dr. Schwalbe told Ms. Kriesch she could not use this space, which remained empty throughout her assignment to the South Building. Ms. Kriesch also offered to work a desk in the common reception area that was used by a part-time student intern, but Dr. Schwalbe would not allow her to do so.

38. Rather than simply moving Ms. Kriesch either back to the Whitten Building or to a third, less threatening and more efficient location, Defendant paid extra money to have locks installed on her office in the South Building, provided her with self-defense training, and assigned Ms. Monroe to serve as Ms. Kriesch's escort when she left her office.

14

39. By contrast, when Mr. Good was required to attend meetings at the APHIS office in Riverdale, MD, Defendant offered leave to Cindy Mowatt (white), a female employee who worked in Riverdale office and, like Ms. Kriesch, was previously harassed by Mr. Good. APHIS also gave Ms. Leperi leave under similar circumstances between 1995 and 1997.

40. On information and belief, Ms. Kriesch was the only full-time African American PPQ employee working in the Whitten Building prior to her relocation. She was also the only PPQ employee relocated to the South Building after her relocation. In or around April 1998, in response to one of Ms. Kriesch's requests for relocation to the Whitten Building, Dr. Schwalbe told her that "your people are over in the South Building; you should be more comfortable there," or words to that effect. (Historically, when USDA employees were segregated by race, African American employees were assigned to the South Building).

41. By January 1999, Ms. Kriesch had been required to relocate to a different office six times over the course of two years, and was sharing office space with other APHIS employees.

_____

42. Ms. Kriesch was discriminated and retaliated against when, on March 16, 1999, she was not selected for the position of Staff Assistant to the APHIS Administrator ("Chief of Staff") advertised in Vacancy Announcement No. 9-32-102-9. Instead, Defendant pre-selected Courtney R. Billet, a white, signif-

15

icantly less qualified GS-13 Legislative Analyst, who had no prior EEO activity.

43. Ms. Kriesch first learned about the vacancy during a conversation with Ms. Billet in which she told Ms. Kreisch not to bother submitting an application because she (Ms. Billet) had been preselected to fill the position, which was not advertised in accordance with established practices. Nevertheless, Ms. Kreisch submitted a timely and complete application packet for the position on January 25, 1999.

44. Previously, on November 30, 1998, Dr. Reed, who served as the selecting official for the Chief of Staff position, gave Ms. Billet a temporary 120-day detail/promotion to a GS-14 Program Management Coordinator position in the Office of the Administrator, effective December 6, 1998. On information and belief, this detail was created for Ms. Billet as an intermediary position until such time as she should could be officially promoted to Chief of Staff.

45. On January 4, 1999, after giving Ms. Billet the detail, Dr. Reed created a new Position Description for the Chief of Staff position. The new Position Description eliminated skills that related to strategic planning, statistical analysis, and organization design, which were intrigal parts of the Chief of Staff's duties. These were also skills that would have made Ms. Kriesch the most qualified candidate for the position in light of her strong background in those areas. The

16

Position Description was not properly certified by a second supervisor, and it was signed by Dr. Reed as the authorizing supervisor, signed by someone other than the actual Position Classification Specialist, and processed all in one day.

46.  The Chief of Staff vacancy was only open for two weeks, between January 11 and 25, 1999, and was not advertised in accordance with APHIS' practices.  The vacancy announcement was not available at the personnel office of APHIS' Washington, D.C. headquarters, and the only copy of the new list of Knowledge, Skills, and Abilities ("KSAs") available at the Riverdale office was hand-written.  The vacancy announcement was also not posted on employee bulletin boards or magazine racks, the APHIS website, or the USAJobs website.

47.  On January 17, 1999, after only one third of her 120-day detail was completed, Ms. Billet was returned to her previous GS-13 Legislative Analysis position so that she could apply for the Chief of Staff position without raising suspicion. Ms. Billet, who applied for the position on January 22, 1999, was taken out of her detail so, according to the Director of Human Resources, it would not "look so bad" when she was later given the Chief of Staff position.  Unlike Ms. Billet, Ms. Kriesch was not afforded an opportunity to serve as the Acting Chief of Staff.

48.  Dr. Reed conducted the candidates' interviews and made his selection without any recommendations from other people. While Ms. Billet went through a comprehensive interview with

17

questions posed exclusively by Dr. Reed, Ms. Kriesch's interview was completed in a perfunctory manner with Joseph J. Frick (white) posing several of the questions. The corresponding Interview Questionnaires for Ms. Billet and Ms. Kriesch were different in both content and format, with Ms. Kreisch being asked fewer and less pertinent questions.

49. Unlike Ms. Billet, Ms. Kreisch was not asked any questions regarding her contacts and experiences with officials from outside APHIS, such as her work with Congress and the Office of the Secretary of Agriculture. Nor was she given an opportunity to discuss or respond to Dr. Reed's expectations for the Chief of Staff position. Also, Ms. Kriesch later learned that certain documents were removed from her application packet after she had submitted it, including five pages of her resume and at least one page of awards she had received, which related to her experiences in these respects.

50. On March 16, 1999, Dr. Reed signed the Promotion/ Selection Certificate appointing Ms. Billet Chief of Staff effective March 28, 1999. Ms. Kreisch learned she had not been selected when, on or about March 15, 1999, before the Selection Certificate was signed, Ms. Billet was heard telling other employees in the APHIS cafeteria that she had "beat out that black woman" for the position.

51. According to Dr. Reed, Ms. Kreisch was the best qualified candidate, but Ms. Billet was selected because she "did favors for the second floor"; an allusion to Ms. Billet's

rapport with the Office of the Secretary of Agriculture. However, Ms. Kreisch had an excellent relationship with that Office, having worked with it on various programs. This relationship is evidenced by the multiple awards and letters of commendations she received from the Office, which were set out on the documents that were removed from her application packet.

52. Ms. Kriesch was also far more qualified than Ms. Billet based on her education and experience. Ms. Kreisch had a Masters degree, while Ms. Billet only had a Bachelors degree. Ms. Kreisch had worked for APHIS for 10 years and other agencies for an additional 10 years before that, while Ms. Billet had only 12 years of experience exclusively with APHIS. Ms. Kreisch had supervised a staff of up to 12 employees, while Ms. Billet had only previously supervised three subordinates. In addition, Ms. Kriesch received the highest possible score (25) on the Evaluation of the Candidates, and she "nailed the interview" according to Mr. Frick.

53. On information and belief, Ms. Billet's application for the Chief of Staff position contained false information of which Dr. Reed was aware.

54. While working with Dr. Reed, Ms. Kriesch heard him make many stereotypical references concerning "Black workers," watermelons, and offal. In or around May 1998, while Dr. Reed and Ms. Kriesch were attending a conference, he leaned over to her and whispered that he understood she could "be difficult for

white men."

_____

55.  Ms. Kriesch was discriminated and retaliated against
when, on or around September 29, 1999, she was denied a promo-
tion consistent with a desk audit that determined she was
entitled to a position upgrade to GS-14 due to accretion of
duties.

56.  In 1999, communication was one of PPQ's most critical
areas of operations, and Ms. Kriesch had programmatic respons-
ibility over much of the communications function and was
developing PPQ's communication policies.  On August 30, 1999,
Richard L. Dunkle, Ph.D (white), PPQ Deputy Administrator,
realigned PPQ to streamline the workflow and managerial over-
sight.  As a result of this realignment, Mr. Eggert assumed
direct supervisory responsibility for several PPQ staff members,
including Ms. Kriesch and Ms. Grupp.

57.  Previously, on August 3, 1999, Dr. Dunkle requested a
desk audit of Ms. Kriesch's GS-13 Communications Manager
position.  Up to that point, Ms. Kriesch had been working
pursuant to Position Description No. 000RV112, which was written
in 1996 with a very broad scope of responsibilities within PPQ,
and was intentionally generic to allow for subsequent growth.
Dr. Dunkle requested the audit due to the position's expanding
functions and the impact Ms. Kriesch had on the position.

58.  Dr. Dunkle gave Ms. Kriesch the responsibility of
serving as the auditor's primary contact person for the purpose

of assessing the position and determining if it was classified at the appropriate grade level. Employee Relations Specialist Kathryn L. Schrack (white) was assigned to perform the audit, and Ms. Kriesch provided her with Dr. Dunkle's written comments regarding the position and reported back to him about the progress of the audit. Ms. Kriesch also continually relayed information back and forth between Dr. Dunkle and Ms. Schrack.

59. Dr. Dunkle was aware that the Position Description was going to be revised during the audit, and that the revision would likely warrant a promotion for Ms. Kriesch. Dr. Dunkle signed a Position Description cover sheet (Form AD-332) and a Request for Personnel Action (Standard Form 52) authorizing the position review and revisions. He also indicated he would support a position upgrade to GS-14 for Ms. Kriesch if Ms. Schrack determined the new Position Description warranted it.

60. Based on the independently confirmed desk audit, Ms. Schrack developed a revised Position Description that correctly restructured the Communications Manager's factor levels to adequately cover assignments Ms. Kriesch had been given and to reflect Ms. Kriesch's impact on the job. On September 3, 1999, Ms. Schrack finalized her audit, concluded that the new Position Description should be properly classified as a GS-14 position due to accretion of duties, and prepared a Decision Memo memorializing this conclusion.

61. Ms. Schrack performed the audit and prepared the subsequent approval materials according to APHIS policies and

practices and in the same fashion as six or seven other position upgrades. Specifically, she submitted a copy of the new Position Description, along with the accompanying SF-52 and Decision Memo to Mary Lynn Horst (white), Director of APHIS Human Resources, for review before being forwarded to Dr. Reed for approval. On information and belief, this process was used to approve position upgrades for white APHIS employees and for employees who had not engaged in protected activities.

62. However, Defendant subjected Ms. Kriesch's position upgrade to a different classification process. Ms. Horst, in consultation with PPQ managers, redirected Ms. Kriesch's position upgrade to Kenneth E. Johnson (African American), Director of the Riverdale/Washington Business Site, and on September 16, 1999, Ms. Kriesch was informed by Mr. Johnson that Defendant was going to conduct a second audit. Ms. Horst falsely claimed Mr. Johnson was responsible for classification work, but Mr. Johnson admitted he had no involvement in Ms. Kriesch's desk audit until after it was forwarded to his office.

63. On or around September 22, 1999, Dr. Schwalbe began communicating with Mr. Johnson regarding the position upgrade and took an active role in halting the upgrade, and Ms. Schrack was given the impression that she was expected to involve Ms. Grupp in the audit process. Then, on or around September 29, 1999, the SF-52 authorizing Ms. Kriesch's position review was returned without action despite the desk audit.

64. Unlike Ms. Kriesch, Jim D'Ambrosia (white) was non-

competitively upgraded to a GS-14 position without a two-tiered auditing process. Similarly, the GS-14 APHIS Administrator's Chief of Staff position held by Ms. Billet was upgraded to the GS-15 level after Defendant selected Ms. Billet over Ms. Kriesch. Also, after refusing to promote Ms. Kriesch through accretion of duties, Defendant gave a significant portion of the Communications Manager's duties to Paula Henstridge (white), and subsequently upgraded her position to the GS-15 level.

65. Defendant claimed, on pretext, that the initial audit was improperly conducted. However, Ms. Schrack performed the audit in accordance with APHIS policies and practices and in the same fashion as six or seven other position upgrades.

66. Defendant also claimed, on pretext, that Ms. Kriesch misrepresented the work she was performing. However, Defendant never reprimanded Ms. Kriesch for her supposed misrepresentation, and she was (and is) able to document all of the assignments she was given by her PPQ managers. Also, Dr. Dunkle trusted her with serving as his point-of-contact for the position, and much of her statements regarding his vision for the position was supported by written statements previously made by Dr. Dunkle, such as his July 26, 1999 memo to all PPQ employees, which made clear that Ms. Kriesch was responsible for developing PPQ's communication policies.

67. When Ms. Kriesch inquired with Dr. Dunkle about whether she was going to be promoted in accordance with the desk audit, he responded: "not hardly, they won't promote someone

like you." It was clear from his statement that he was refer-ring to Dr. Schwalbe, Dr. Reed, and possibly others. Ms. Kriesch had already filed her second EEO complaint (Agency Case No. 990793), which named Dr. Reed as an offending official.

_____

68. Ms. Kriesch was discriminated and retaliated against when, between October 11 and November 21, 1999, and beyond, she was assigned to Resource Management Support under the super-vision of Ms. Grupp, thereby lowering her position rank, many of her "as-audited GS-14" duties and responsibilities were taken away and given to a white GS-14, she was issued a new Position Description and lower-level assignment to assure she would not be promoted, and her supervisors began treating her in a hostile and abusive manner.

69. On October 12, 1999, Ms. Kriesch was informed by Dr. Schwalbe that she was being relocated to the Riverdale office. On October 8, 1999, while Ms. Kriesch was on annual leave, Dr. Schwalbe issued her a memo stating she was going to be relocated to the Riverdale office, and she needed to have her office packed by the close of business on October 15, 1999. Dr. Schwalbe knew Ms, Kriesch was on leave and that she was not scheduled to return until October 12, 1999. Because Ms. Kreisch was only given four days of notice to pack her office and she had several meeting already planned for that period, she asked Dr. Schwalbe and Dr. Dunkle for an extension of time to prepare for the move, which was subsequently granted due in part to the

24

fact that Ms. Kreisch was expected to facilitate a 3-day work-
shop the next week and was forced to take sick leave because of
an illness.

71. During the October 12, 1999 meeting about Ms.
Kriesch's move, Dr. Dunkle indicated he had not known about the
effective date of the move, and Dr. Schwalbe refused to explain
who had know about the move and when.  Ms. Kreisch later learned
that white employees involved in the move had at least one month
of prior notice.  On information and belief, Dr. Schwalbe had
planned to move Ms. Kriesch's office (and personal belongings)
while she was on leave, but was prevented from doing so because
building services could not comply with his initial pick-up
date.  Moreover, as late as October 14, 1999, Ms. Grupp, the
Director of the Riverdale office, informed Ms. Kriesch that she
had "no where to go" in Riverdale because the office into which
she was moving had been "lotteried off" to another employee.

72. Despite the fact previously granted extension of time,
Ms. Kriesch's office and personal belongings were packed up
without her knowledge.  She discovered this on October 21, 1999,
when she went to her office after hours to begin packing.
Defendant's actions caused significant damage to Ms. Kriesch's
computers, files, and personal property, some of which was
misplaced or permanently broken (est. $5,000.00 worth of
government property was damaged).

73. On October 13, 1999, as part of Ms. Kriesch's reloca-
tion, she was also notified that Ms. Grupp would serve as her

temporary supervisor. However, this contradicted the PPQ realignment plan, which identified Mr. Eggert as her first-line supervisor, as well as assurances she was given that her position would remain intact and she would continue to work out of the Office of the Deputy Administrator. According to the PPQ realignment plan, Ms. Kriesch and Ms. Grupp both reported to Mr. Eggert, so this change lowered Ms. Kriesch's rank. This so-called temporary arrangement was subsequently made permanent.

74. Ms. Kreisch's Communications Manager position was later abolished by Dr. Schwalbe, effective November 21, 1999, and she was reclassified into new Position Description written by Ms. Grupp (Position Description No. 099PPQ62).

75. On September 26, 1999, prior to her relocation and reassignment, and the abolishment of her Communications Manager position, Ms. Kriesch filed her third EEO complaint (Agency Case No. 000170). On information and belief, no white employee and no employees who engaged in previous protected activities were relocated to the Riverdale office, had their rank within PQQ reduced, or had their positions abolished.

76. Following her relocation to the Riverdale office under Ms. Grupp's supervision, Ms. Kreisch was not given the office space, materials, and resources she needed to properly perform her duties.

76. Following Ms. Kriesch's relocation, reassignment, and reclassification, Ms. Grupp also began stripping her of her prior duties and assigning her to ministerial tasks. Her work

on PPQ's Plain Language Initiative was eliminated.  Ms. Schrack had to remind Ms. Grupp that one of Ms. Kriesch's vital duties was to coordinate PPQ's internet website, a responsibility Ms. Grupp eliminated from her written explanation of the new Communications Manager position while simultaneously expecting Ms. Kriesch to perform.  Similarly, Ms. Kriesch was told that "there is no assigned role for [her]" with respect to the PPQMT meetings, which Ms. Kriesch used to coordinate (according to Ms. Grupp that fact "may change, as all things change...").

77.  On information and belief, many of the duties that Ms. Kriesch previously performed as Communications Manager were given to Ms. Henstridge, a white GS-14 employee with no prior protected activities.

78.  The restrictions Ms. Grupp placed on Ms. Kreisch severely impaired her ability to effectively perform her duties. Moreover, Ms. Grupp knew that only 25 percent of the duties she assigned to Ms. Kriesch had to be up to the GS-13 level, and she continually assigned Ms. Kriesch to ministerial tasks that were well below her grade level.

79. Defendant claims, on pretext, that Ms. Kriesch's relocation and reassignment were due to PPQ's realignment and that other employees were similarly impacted by the reorganization. However, the realignment to which Defendant references occurred on August 30, 1999.

80. Defendant claims, on pretext, that Ms. Kriesch's reclassification was based on a position review.  As noted

above, Defendant claims, on pretext, that Ms. Kreisch's desk audit was improperly conducted, that a second desk audit was needed, and assured Ms. Kreisch that she was going to be allowed to participate in the second audit.  However, no desk audit or position review took place before Ms. Kriesch's position was reclassified.  Instead, PPQ managers unilaterally created the new Position Description.  In fact, APHIS Human Resources employees, including Supervisory Human Resources Specialist Towanda B. McLeod (African American) and Catherine M. Metcalf informed Dr. Schwalbe and Ms. Grupp that no "position review" had taken place and stated their intention to remove that notation from the Notification of Personnel Action (SF-50) that memorialized reclassification.

——————————

81.  Ms. Kriesch was discriminated and retaliated against when, in March 2000, Defendant improperly processed her Work Place Violence report.

82.  On March 20, 2000, Ms. Grupp issued Ms. Kreisch a Notice of Proposed Suspension, and during the course of doing so acted in a hostile, abusive, and threatening manner that made Ms. Kriesch reasonably fearful that she might be assaulted.  Ms. Grupp pursued Ms. Kreisch down a hallway after Ms. Kreisch refused to sign the Notice without first reading it and subsequently tried to copy it.

83.  While Ms. Kriesch was copying the Notice, Ms. Grupp told her, "We know what to do with people like you, I'm going

to suspend you again and again until you don't have a job" or words to that effect.  In response, Ms. Kreisch expressed her belief that the Notice was given to her in retaliation for her prior EEO complaint, and corrected Ms. Grupp's mistaken claim that Ms. Kriesch's informal EEO complaints did not constitute a protected activity.  This angered Ms. Grupp, who began raising her voice, approaching Ms. Kriesch in an aggressive manner, taking items out of her hands, and eventually hitting a wall with her fist.  On another occasion, she kicked Ms. Kriesch's door open, yelled and screamed at her, and falsely accused her of serious wrongdoing.

84.  Scared by Ms. Grupp's violent actions, Ms. Kriesch had a reasonable fear for her well-being and safety, immediately ran to the building security station, and reported the incident to the Security Guard, who recorded her statement and noted that she appeared visibly upset.

85.  Later that evening Ms. Grupp tried to take personal possessions out of Ms. Kriesch's purse, which Ms. Monroe had volunteered to bring to Ms. Kriesch.  Ms. Grupp made Ms. Monroe feel nervous and bullied, particularly given her body posture and statement that Ms. Monroe needed to be careful and watch herself.

86.  The following day, Ms. Kriesch reported the incident to the Federal Protective Service, as well as Dr. Dunkle.  On information and belief, Dr. Dunkle forwarded Ms. Kriesch's complaint to George Robertson (white), who was previously

29

involved in the events surrounding Mr. Good and Complaint One. Later, Ms. Kriesch's incident report was investigated by Mary S. Neal (African American).

87. On information and belief, Defendant did not adequately and properly investigate the March 20, 2000 incident or take any disciplinary actions against Ms. Grupp, in contrast to official policies and practices, and Defendant's treatment toward similarly situated white employees and employees who had not engaged in protected activities.

———————

88. Ms. Kriesch was discriminated against when she was suspended for three days between August 15 and 17, 2000, and by the events related to the suspension.

89. On January 24, 2000, Ms. Grupp issued Ms. Kreisch a Letter of Counseling for allegedly failing to provide Ms. Grupp with a particular work product. However, this disciplinary action was subsequently dismissed.

90. As noted above, on March 20, 2000, Ms. Grupp attempted to discipline Ms. Kreisch a second time by issuing her a Notice of Proposed Suspension for allegedly failing to follow Ms. Grupp's instruction. The suspension was proposed for seven days for five alleged specifications.

91. Ms. Kriesch was accused of not completing assignments that were sent to her via email when, as noted above, her computer equipment had been damaged and she did not have computer access for an extended period of time. Ms. Grupp knew

Ms. Kriesch had trouble obtaining computer access, yet continued to hold her responsible for assignments delivered by email. Ms. Grupp also accused Ms. Kriesch of failing to complete work that was not only completed, but signed as received by Ms. Grupp's secretary.

91. Ms. Kriesch challenged the proposed suspension, and Mr. Eggert served as the deciding official responsible for assessing the proposed suspension. Mr. Eggert issued his decision on August 3, 2000, which dismissed two of the five specifications and reduced the suspension to three days.

92. APHIS practice is to assign an outside, neutral third party to serve as the deciding official for disciplinary actions; often an employee of the Conflict Mediation Office. However, Defendant did not follow this practice when it allowed Mr. Eggert, a PPQ manager who was fully aware of most of the incidents alleged in this Complaint, to serve as the deciding official.

93. On information and belief, Defendant did not take any disciplinary actions against any white employees or employees who had not engaged in protected activities for similar or worst offenses.

_____

94. Ms. Kriesch was retaliated against when, in June 2001, she was denied a promotion to the GS-14 Program Analyst position advertised in Merit Promotion Announcement 9-77-165-1 despite her qualifications, experience, and successful performance.

95.  The primary responsibility of this position, as it was originally advertised, was strategic planning.  The list of KSAs for an employee to be considered "one of the best qualified" candidates for the position included knowledge "strategic planning," "skills in use of long-range planning," and the ability to communicate.

96.  Ms. Kriesch was not selected for the GS-14 Program Analyst position because of her prior protected EEO activities, including EEO Complaint One, the subsequent three EEO complaints detailed above ("EEO Complaint Two"), and her other protected activities.

97.  John Payne (white male), Ms. Kriesch's former first-level supervisor and the former Associate Director of PPQ Plant Health Programs, knew about Ms. Kriesch's protected EEO activities in 2001.  Ms. Kriesch was reassigned to work under Mr. Payne's supervision in 1998 as a direct result of EEO Complaint Two and they had spoken about her EEO activities.  He also knew about her involvement in the Coalition because she requested leave from him on several occasion in order to participate in meetings or events related to her duties with the organization. (Mr. Payne routinely denied these requests and required Ms. Kriesch to use flex time or personal leave in order to participate in these Coalition events.)

98.  Ms. Kriesch's former second-level supervisor Ms. Neal, the former Director of PPQ Plant Health Programs, also knew about Ms. Kriesch's protected EEO activities in 2001.  As noted

above, Ms. Neal was involved in the workplace violence investigation that resulted from EEO Complaint One and was named as an Agency official in EEO Complaint Two.

99.    Other USDA employees who were involved in this non-selection also knew about Ms. Kriesch's prior protected activities in 2001 included Faith Taylor, Andrea Morgan, M.D., and Mr. Payne's Assistant, Russell Caplen, who had previously harassed Ms. Kriesch regarding her prior sexual assault.

100.    On February 26, 2001, Ms. Kriesch applied for the GS-14 Program Analyst position advertised in Merit Promotion Announcement 9-77-165-1 by submitting her resume and an SF-171 application package.

101.    Other candidates, including selectee Linda Banks, also applied for this position.

102.    Ms. Banks had never engaged in any protected EEO activities, and she has stated that she would never file an EEO complaint because she does not believe in the EEO process.

103.    A Merit Promotion Panel chaired by Cheri A. Oswalt, which consisted of USDA Human Resources Specialists and technical matter experts, reviewed the candidates' applications for qualifications and experience by matching them against the KSA's listed in the Merit Promotion Announcement.  This panel determined that Ms. Kriesch was one of the best qualified candidates and placed her on the Certificate of Eligibles, i.e., the Best Qualified List ("BQL").

104.    The BQL was then forwarded to Mr. Payne, who served

as the selecting official.  Ms. Neal served as the approving/ concurring official.

105.  After receiving the BQL, Mr. Payne established two additional panels to review the candidates' qualifications further: a Technical (Paper) Panel, which reviewed the candidates' applications, and a Behavioral Event Interview ("BEI") Panel, which performed interviews.

106.  Vacancies at APHIS are typically filled through the use of only one panel to establish the BQL, followed by interviews, but Mr. Payne deviated from Agency practices by assembling the Paper Panel as an additional pretextual hurdle.

107.  Mr. Payne chose the individuals who served on these panels.  The Paper Panel consisted of three individuals: Michael Colbert, Elna Hunter, and Phil Carcia, who was not an expert in strategic planning.  The BEI Panel consisted of four individuals: Ms. Taylor (facilitator), Dr. Morgan, Ron Komsa, and Cynthia Mercado.  Mr. Caplen served as the administrator for both of the Panels.

108.  Instead of using the KSA's that were previously listed in the Merit Promotion Announcement and made available to all the candidates, after the BQL was established Mr. Payne created different standard of review questions and criteria to be used by the panels.  Unlike the publicized KSA's, these new criteria did not match the Merit Promotion Announcement, they minimized the importance of strategic planning, and they were intentionally written to favor Ms. Banks' selection.

34

109.    In addition to her initial application packet, Ms. Kriesch also submitted a second packet of information as part of her BEI and a third packet containing samples of her strategic planning work. By contrast, Ms. Banks did not prepare documentation for her BEI.   These application packets were received by Mr. Payne.

110.    Although the three interview packets Ms. Kriesch submitted for consideration were complete and well organized, the copies of these documents that were given to the Panel participants for review were incomplete, did not include all of the documents Ms. Kriesch had submitted, and were rearranged in a disorganized and unprofessional manner.

111.    The Paper Panel never convened, never discussed the candidates' applications as a group, and never agreed upon (i.e., certified) the candidates' scores.  The individual Panel members gave their scores to Mr. Caplen to be compiled, and he was the only person, other then Mr. Payne, who was privy to all of the individual scores.

112.    The Paper Panel's top four scores were given to Ms. Kriesch, Ms. Banks (no EEO activity), Mary "Connie" Williams (no EEO activity), and Ruth Rosenthal (no EEO activity).

113.    During a meeting prior to the candidates' inter-views, Mr. Payne spoke to the BEI Panel members about EEO activities as the PPQ and BEI Panel facilitator.  Ms. Taylor informed the panelists that one of the candidates was an EEO grievant who had previously filed an EEO complaint about a PPQ

personnel action. Ms. Taylor later informed Dr. Morgan that Ms. Kriesch was the applicant who filed the EEO complaint.

114.    Ms. Grupp, who at the time was under investigation for alleged workplace violence against Ms. Kriesch, was present outside the BEI room prior to Ms. Kriesch's interview, even though she did not work in that corridor, which only housed two conference rooms and the computer center personnel.

115.    The BEI Panel's top three scores were given to Ms. Kriesch, Ms. Banks, and Ms. Williams.  Ms. Kriesch, who was considered the best (i.e., "unreachable") candidate after her interview, earned the highest ranking of any of the other candidates, including Ms. Banks.

116.    After receiving the BEI Panel's scores and recommendations, Mr. Payne changed the reported scores by arbitrarily giving additional points to Ms. Banks outside of the BEI Panel's purview, review, or concurrence.  Ms. Neal later admitted that Mr. Payne's actions were discriminatory.

117.    Based on the work of both the Paper and BEI Panels, three individuals were referred to Mr. Payne for consideration: Ms. Kriesch, Ms. Banks, and Ms. Williams.  Ms. Kriesch earned the highest aggregate panel score.

118.    In July 2001, Mr. Payne selected Ms. Banks to fill the positions, and her GS-14 promotion became effective on January 28, 2001.

119.    Ms. Kriesch's training and experience clearly exceeded Ms. Banks' qualifications.  Ms. Kriesch had been

involved in strategic planning since 1985, while Ms. Banks had never conducted strategic planning. Furthermore, Ms. Kriesch had written an award-winning Masters thesis was on strategic planning (unlike Ms. Banks), and the Panel participants acknowledged that Ms. Kriesch's professionalism and considered her the unreachably best qualified candidate.

120. Witnesses who proffered statements in support of Ms. Kriesch during the administrative process were subsequently subjected to false accusations and frivolous investigations as a means of retaliating against them for participating in the EEO investigation.

## CAUSE OF ACTION

### Count I

121. Based upon the facts described above, Defendant unlawfully discriminated against Plaintiff Penny E. Kriesch on the basis of her race (African American) and retaliated against her on the basis of her prior protected EEO activity by subjecting her to adverse personnel actions, as described in subparagraphs (a) through (d), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e.

121(a). Ms. Kriesch was subjected to adverse personnel action when she was not given performance standards necessary to receive cash awards when white employees were given such standards.

121(b). Ms. Kriesch was subjected to adverse personnel action when she was not selected for a 120 day detail of a GS-14

position, and subsequently for the full-time position, and a white employee, with lesser qualifications, was selected.

121(c).  Ms. Kriesch was subjected to adverse personnel action when she was denied an upgrade consistent with a desk audit and subjected to atypical procedures during the audit.

121(d). Ms. Kriesch was subjected to adverse personnel action when she was eliminated from her higher level functions, including the Plain Language program and removed from the APHIS headquarters.

### Count II

122.  Based upon the facts described above, Defendant unlawfully discriminated against Plaintiff Penny E. Kriesch on the basis of her race (African American) and retaliated against her on the basis of her prior protected EEO activity by subjecting her to a hostile work environment, as described in subparagraphs (a) and (b), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e.

122(a). Ms. Kriesch was subjected to a hostile work environment when she was moved to an office near John Good, who had previously sexually assaulted her, and who continued to harass her in the new office.

122(b). Ms. Kriesch was subjected to a hostile work environment when she was assaulted by Mona Grupp, and the Workplace Violence Report for this incident was not processed appropriately.

### Count III

123.    Based upon the facts described above, Defendant unlawfully retaliated against Plaintiff Penny E. Kriesch on the basis of her prior protected EEO activity by denying her a promotion to the GS-14 position advertised in Merit Promotion Announcement 9-77-165-1 in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e.

## RELIEF REQUESTED

124.    Plaintiff requests the following relief:

a.    Immediate retroactive promotion of Plaintiff to a GS-14 position for the period August 1999 to June 2003;

b.    Full back pay, with interest, and benefits for the period of Plaintiff's discriminatory/retaliatory non-promotion to GS-14;

c.    A GS-15 position or equivalent pay to alleviate the effects of Plaintiff's earlier discriminatory/retaliatory non-promotion to GS-14;

d.    Maximum compensatory damages to which Plaintiff is entitled after proof at trial up to the maximum of $300,000;

e.    Appropriate record correction consistent with the facts of this case and the above requested relief;

f.    An Injunction enjoining Defendant from discriminating or retaliating against any employee, including Plaintiff; with appropriate notices of

the Injunction posted at the APHIS Animal and Plant Health Inspection Service in Riverdale, Maryland;

g.   The reasonable attorney fees at prevailing market (<u>Laffey</u>) rates, costs, and expenses of this action; and

h.   Such other relief as the Court deems just and appropriate.

## JURY TRIAL

125.   Plaintiff requests a trial by jury on all issues that are triable by jury.


Joseph D. Gebhardt
_____
JOSEPH D. GEBHARDT
   (D.C. Bar No. 113894)
MARK A. DANN
   (D.C. Bar No. 484523)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202) 496-0400

June 20, 2006                    Attorneys for Plaintiff