**EXHIBIT 10**

# REPORT OF COUNSELING

**EEO COUNSELOR:** Linda M. Smalls

**ADDRESS:** 1730 N. Lynn Street, Suite 601
Arlington, VA 22209

**PHONE #:** (703) 528-4921

## INFORMATION ABOUT THE COMPLAINANT/CLASS AGENT

Name (Last/First/MI): Kriesch, Penny E.

Title/Series/Grade: Communications Manager GS-301-13

Organization: US Department of Agriculture
Animal & Plant Health Inspection Service (APHIS)
Plant Protection and Quarantine

Work Address: 14th & Independence Avenue, S.W.
Washington, DC 20250-3431

Work Phone #: (202) 720-4263    Home Phone #: (301) 559-1739

Anonymity: No    Union: No

Complainant Representative (if any): Attorney Kamala M. Vasagam (202) 939-3350
The Chavers Law Firm, PC
1400 Sixteenth Street, NW, Suite 330, WDC 20036

## RESPONDING OFFICIAL (RO)

Name/Title: Dr. Craig Reed, Administrator, APHIS
Address: Jamie L. Whitten Bldg., Room 311-E
14th & Independence Avenue, S.W., WDC 20250-3431
Phone #: (202) 720-3861

## COMPLAINT INFORMATION

Basis of Complaint: Age (43), Race, and Reprisal
Issue of Complaint (including date of each issue):
(1) Assignment of Duties (January 1998 - January 1999)
(2) Awards (January 1997 - present)
(3) Evaluation/Appraisal (1997 - present)
(4) Harassment/Sexual (sometime in 1998, specific date not provided)
(5) Promotion/Non-selection (March 19, 1999 - the date she was notified of non-selection)
(6) Training (January 1998 - January 1999)

## COUNSELING PROCESS

Date of First Contact: May 4, 1999
Extension Granted: Yes (June 22, 1999)
Certified Mail Article Number: N/A
Date Right to File Notice Issued: June 22, 1999
Date Counselor's Report Issued: June 28, 1999

Exhibit 3A

Page 2 of 39

REPORT OF COUNSELING

THE ISSUE(S):

(1) Assignment/Duties: The Counselee alleges that one year prior to the Chief of Staff/Staff Assistant to the Administrator position becoming available, Ms. Courtney Billet (a younger Caucasian female) was given special assignments by the Administrator of APHIS to enable her to qualify to apply for the position. (January 1998 - January 1999)
(2) Awards: The Counselee alleges that she has not received a cash award for the past two years. (January 1997 - the present)
(3) Evaluation/Appraisal: The Counselee alleges that she has not received a performance evaluation for the past two years. (1997 - the present)
(4) Harassment/Sexual: The Counselee alleges that a former supervisor who had been fired as a result of this issue, was re-hired by the agency and placed in an office four doors down form the Counselee's office. (sometime in 1998 was when she made the request Reed, Elder and Schwalbe which was refused; she was unable to specific the date of her request except to indicate that occurred sometime in 1988)
(5) Promotion/Non-Selection: The Counselee alleges that her non-selection for the position of Chief of Staff/Staff Assistant to the Administrator was based on her age (43) and race. (March 19, 1999 - the date Counselee was notified that she was not selected)
(6) Training: The Counselee alleges that she was not given the same opportunity as Ms. Billet to receive special assignments. (January 1998 - January 1999)

SPECIFIC CORRECTIVE ACTION(S) REQUESTED BY COMPLAINANT:

(1) Retroactive promotion from the time at which the vacancy announcement for the Chief of Staff/Staff Assistant to the Administrator position was published.
(2) A change in her reporting lines of authority, the Counselee would like to report to the Deputy Administrator of Plant Protection and Quarantine (PPQ).
(3) A change in the location of her office to the Whitten building or a reformulation of her job functions to enable her to report to the Riverdale location.
(4) The performance evaluations for the past two years with a rating of outstanding along with the appropriate cash awards.
(5) A thereat assessment evaluation completed by an outside party.
(6) A written policy from the Administrator of APHIS regarding the keeping of records of persons found to have sexually harassed others, to prevent the harasser from ever being placed near the harassee.
(7) The maximum in compensatory damages.
(8) The payment of attorney's fees.

NAME, TITLE, WORK ADDRESS, PHONE NUMBER, AND NATURE OF INVOLVEMENT OF OTHERS IN THE CASE:

(1) Dr. Craig Reed, Administrator, APHIS (202) 720-3861
    Dr. Reed is the responding official who was responsible for selecting the candidate for the Chief of Staff/Staff Assistant to the Administrator position. He is also the individual who has the authority to resolve the issues presented in this case.

Exhibit 3A

Page 3 of 2

39

(2) Joe Frick, then Acting Chief of Staff, Riverdale Office (301) 734-6503
Mr. Frick was involved in the interviewing process of the candidates for the Chief of Staff/Staff Assistant to the Administrator position.

(3) MaryLynn Horst, Director of Human Resources for MRP (202) 720-6377
The Counselee named Ms. Horst as the individual responsible for the change in the job description for the Chief of Staff/Staff Assistant to the Administrator position. She could also clarify agency policy and procedures in relation to the selection process.

(4) Beverly Reader, Personnel Specialist, Riverdale Office (301) 734-5463
Ms. Reader was named by Ms. Horst as the person to contact to receive documents that were pertinent to this case. This includes the vacancy announcement for the Chief of Staff position and the documents submitted in application for the position by the candidates.

(5) Kathy Bolderson, Secretary, Riverdale Office (301) 734-7324
The Counselee named Ms. Bolderson as an individual who could attest to the time length of each interview by the candidates for the Chief of Staff position.

(6) Dr. Andrea Morgan, Director of ISP, Riverdale Office (301) 734-5100
The Counselee named Dr. Morgan as an individual who could attest to statements made by Joe Frick regarding the interview of the Counselee. Unfortunately this EEO Counselor was unable to reach Dr. Morgan prior to the close of the counseling period.

## FACTS DEVELOPED IN THE INQUIRY:

### Counselee: Penny Kriesch

On May 21, 1999, the initial interview was held. Present for the interview were the Counselee, Attorney Kamala Vasagam, and myself. I first explained to the Counselee my role as the EEO Counselor and her rights during the informal process. The Counselee was also provided with a written copy of said rights. (See Attachment #1) The Counselee was informed that the counseling period was to expire on May 22, 1999, she was asked and granted a thirty-day extension of the counseling period. (See Attachment #2)

In January 1999, the Counselee applied for the position of APHIS Chief of Staff/Staff Assistant to the Administrator a GS-15 position and was not selected. The position was given to Ms. Courtney Billet, a young Caucasian female who was a GS-13 at the time. The Counselee alleges that 120 days prior to the vacancy announcement being published, the position description was re-written to a GS-14 to accommodate Ms. Billet.

When the position was vacated by the former Chief of Staff, Dr. Craig Reed made the decision to non-competitively promote Ms. Billet as Acting Chief of Staff. Shortly thereafter in a conversation with the Counselee, Ms. Billet is alleged to have stated that she was being removed from the position temporarily so that it would not look bad when it was given to her permanently. Ms. Billet was indeed removed as Acting and replaced by Joe Frick. The Counselee's conversation with Ms. Billet was when she first became aware that the Chief of Staff position was being opened up competitively.

The following week, the Counselee went to the Human Resources Office to obtain a copy of the vacancy announcement. She was told that although the position was open, it was not being advertised because they were still in the process of writing the vacancy announcement.

Exhibit 3A

Page 3 of 29

(See Attachment #3) The Counselee was allowed to hand write the Knowledge, Skills, and Abilities required by the position, to enable her to apply. There were three applicants for the position which the Counselee believed was unusual because it was such a high level position.

The Counselee alleges that the normal Merit Promotion Practice for high level positions was not adhered to. It has been the practice of the agency to conduct a Behavior Event Interview (BEI), where a panel of interviewers using an objective criteria, make recommendations to the supervisor of who is the best candidate. Although this is not a mandated policy, it is the common practice used by the agency according to the Counselee, this was not done for the Chief of Staff/Staff Assistant to the Administrator position.

At the end of February or early March 1999, the Counselee was unsure of the timeframe; Dr. Criag Reed and Joe Frick interviewed the three applicants for the Chief of Staff/Staff Assistant to the Administrator position. The Counselee's interview lasted for 1½ hours. Dr. Reed told her that she had the most professional resume, application, and best-written KSA's they had received. After the interview, Joe Frick commented to the Counselee that she had "nailed" the interview. He also commented to Dr. Andrea Morgan that the Counselee gave an outstanding interview and was the top interviewee.

On March 19, 1999, the Counselee was notified that she was not selected for the position. She spoke with Dr. Reed who indicated she had the most education, longer years of experience, more awards, and better appraisals, however he was selecting Ms. Billet for the job. (See Attachment #4) When the Counselee asked why, Dr. Reed responded that Ms. Billet had a special "in" with the Undersecretary Mike Dunn, she had done special work for him. Dr. Reed could not specify for the Counselee what special work Ms. Billet performed. Dr. Reed then indicated that Mike Dunn believed the Counselee was an excellent worker and he had no problem with her getting the position, however the decision was solely that of Dr. Reed. The Counselee alleges that she was never asked about any political contacts she may have had during her interview with Dr. Reed. Also, her current supervisors were not asked their opinions in regard to whether the Counselee would do a good job in the position. Further, Ms. Billet has been employed with the agency for five years as a Public Affairs Specialist and she has never had any managerial responsibility as that required by the Chief of Staff/Staff Assistant to the Administrator position. (See Attachment #5) The Counselee alleges that it was known for a year that the previous Chief of Staff was going to retire. Ms Billet was then given special assignments to enable her to qualify to for the position, the job description for the Chief of Staff/Staff Assistant to the Administrator position was re-written to fit Ms. Billet. The Counselee believes her selection for the position would have integrated the management team, which is comprised of all white males with the exception of two persons. She believes that Dr. Reed could not imagine a black woman in the position. Although the Counselee has not received performance evaluations for the past two years nor the appropriate cash awards, she felt that her previous performance evaluations, awards, and experience made her more qualified candidate than Ms. Billet to for the position of Chief of Staff/Staff Assistant to the Administrator.

Finally, the Counselee alleged that her non-selection was due in part to her previous EEO activity. In January 1990, the Counselee filed a Formal EEO Complaint where her basis was sexual harassment. This resulted in the firing of her former supervisor John Goode, the alleged harasser. After a successful appeal of the decision, Mr. Goode was reinstated at the agency and given an office four doors down from the Counselee. The Counselee asked on many occasions that her office be relocated however her requests were denied. Her requests were made sometime in 1998, Counselee was unclear as to exactly when in 1988, and the requests were made to Dr. Reed, Al Elder, and Chuck Schwalbe. She believes that Dr. Reed was aware of her past EEO Activity and the current situation and that it played a role in her non-selection because she may have been viewed as a troublemaker.

Exhibit 3A

Page 5 of 39

Kathy Bolderson, Secretary

On June 21, 1999, I interviewed Ms. Bolderson by telephone. This EEO Counselor asked Ms. Bolderson if she had any knowledge of how long the interviews of the applicants for the Chief of Staff/Staff Assistant to the Administrator position lasted. She responded that the Counselee's interview with Dr. Reed lasted 1½ hours. She did not see Ms. Billet go in for her interview, because she left the office for a doctor's appointment. Ms. Bolderson returned from her doctor's appointment approximately 20 minutes later during the time Ms. Billet was scheduled to be interviewing with Dr. Reed however no one was in the office. Ms. Bolderson saw the Administrator in the cafeteria and asked if he had his interview whereupon he responded that everything was taken care of. She thought this was strange because it would have meant that the interview with Ms. Billet lasted only 5 minutes.

MaryLynn Horst, Director of Human Resources for MRP

On June 21, 1999, I interviewed Ms. Horst by telephone. I asked Ms. Horst why the position description for Chief of Staff/Staff Assistant to the Administrator was re-written. She responded that she has weekly meetings with Dr. Reed who asked her to take a look at the position. He wanted a determination of whether the job description was appropriate for a GS-15. Ms. Horst had a classification specialist look at the job description and it was determined that the more appropriate grade was that of a GS-14, therefore the job description was re-written.

Ms. Horst was then asked whether there was a vacancy announcement for the position. She responded that there was a vacancy announcement, however she was unsure of the date the announcement came out. (See Attachment #3) She suggested that I speak with Beverly Reader who could provide me with this information as well as the documents submitted by the candidates in applying for the position of Chief of Staff/Staff Assistant to the Administrator. (See Attachments 3, 4, & 5)

I then asked Ms. Horst if it was her suggestion to remove Ms. Billet from the position as Acting Chief of Staff because it would look bad when she received the position permanently. Ms. Horst stated that she did advise Dr. Reed that if Courtney was a candidate for the Chief of Staff position that she should be removed as Acting Chief of Staff.

My final question for Ms. Horst was regarding the Merit Promotion Plan, specifically Behavioral Event Interviews. Ms. Horst stated that the BEI can be used in a variety of ways, it is not a prescribed way used in the selection process. She indicated that while PVQ has made them mandatory for their positions, its use is discretionary. The BEI is a way to gather information and is just a tool for conducting interviews. The Merit Promotion Plan indicates how positions are going to be filled but it does not detail what method should be used for interviewing a perspective applicant.

Joe Frick, then Acting Chief of Staff

On June 17, 1999, I interviewed Mr. Frick by telephone. Mr. Frick indicated that he was made the Acting Chief of Staff for approximately two months. Prior to him, the Acting Chief of Staff was Courtney Billet. The Administrator asked that Mr. Frick be Acting because Courtney was involved in doing projects for the Undersecretary's Office and could not perform both jobs at one time. Ms. Billet was helping out in the Undersecretary's Office because his Assistant Chris Sarcome had to take emergency family leave.

When asked about the interview process, Mr. Frick responded that he sat in on each of the interviews of the applicants for the Chief of Staff /Staff Assistant to the Administrator position

Exhibit 3A

Page 5 of 39

with each interview lasting 1½ hours. He believed that each candidate interviewed extremely well and that they were all highly qualified for the position. The final decision to select Ms. Billet rested solely with Dr. Reed. Mr. Frick indicated that he was glad that he did not have to make the decision.

When asked about his knowledge of the Behavioral Event Interview, he responded that it was an option that any selecting official could use but he was not aware of it being a mandatory written policy. Finally, when asked about the comments alleged by the Counselee to have been made by him regarding her interview, Mr. Frick responded he told the Counselee that she did a very good job. He did not believe he told the Counselee that she "nailed" her interview nor does he recall making any statements to Dr. Andrea Morgan. He further indicated that he also told the other applicants that they did very well.

### Dr. Craig Reed, APHIS Administrator

On June 17, 1999, I interviewed Dr. Reed by telephone. Dr. Reed answered specific questions posed to him by this EEO Counselor regarding the allegations that were made by the Counselee. Dr. Reed indicated that there were two Chief of Staff positions, one was a GS-15 and the other a GS-14, the Counselee interviewed for the GS-14 position. When asked why the position description was re-written, he responded it was re-written to reflect the things he needed in a Chief of Staff/Staff Assistant to the Administrator.

Dr. Reed indicated that Courtney Billet was picked to be the Acting Chief of Staff because of her experience working in the Office of the Undersecretary. The retiring Chief of Staff relayed that most of his work was done with that office, therefore, Dr. Reed believed Ms. Billet was an appropriate choice. Her removal as Acting Chief of Staff was due to her only being available to serve in that capacity for a short time, her supervisor Patrick Collins, needed her back.

When asked was there a vacancy announcement for the position, Dr. Reed responded that there was and that there were three applicants for the position. The applicants interviewed with himself and Joe Frick, each interview lasting about 1 hour unless some ran over. Dr. Reed denied that he told the Counselee that she had the best resume and KSA's of all of the applicants. Although he believed the Counselee had an excellent application and KSA's, they were not better than those of the person he selected for the position, Ms. Billet. In response to questions regarding the Behavioral Event Interview, Dr. Reed responded it was the option of the selecting official to use or not use that interviewing tool. He did not use it in this case because he felt that all of the applicants had the core competency requirements for the position and that a standard interview would be enough to help differentiate between the three candidates.

Dr. Reed felt that although all of the applicants were good, there were two areas where Ms. Billet had better success. Those were her understanding of dealing with the political environment in the Undersecretary's Office and her ability to interact with the major players on his staff. He believed these were the two things which distinguished Ms. Billet from the Counselee. Dr. Reed further stated he felt that all of the candidates interviewed well for the position. The Counselee had a variety of experiences and good writing skills, however they were not as good as the selectee. The Counselee would have been an easy choice if Ms. Billet were not a candidate for the position. Dr. Reed denied that Ms. Billet was given special assignments to enable her to qualify to apply for the position.

When asked whether the selection of the Counselee would have integrated his management team, Dr. Reed responded that he has both females and blacks on his staff. His Associate Administrator is a White female and his Special Assistant is a black male. His Department Administrators consist of three White males, an Asian male, a Hispanic male, and a White female.

Exhibit 3A

Page 7 of 39

Dr. Reed was then [ask]ed whether the Counselee's past incide[nt] with John Goode had a bearing on her non-selection for the Chief of Staff position. He responded that he did not know John Goode and would not know him if he walked into his office. He has no knowledge of any past incidents the Counselee may have had with him, he only knew that the Counselee had brought his name up as someone she had a problem with.

## RESOLUTION EFFORTS:

This EEO Counselor addressed with Dr. Reed the relief that was being sought by the Counselee. (See Specific Corrective Action) His responses were as follows:
(1) Retroactive Promotion – Dr. Reed needed clarification of exactly what the Counselee was seeking.
(2) Reporting Authority – Dr. Reed said he did not know whom the Counselee currently reported to, he believed it was the Deputy Administrator of PPQ.
(3) Office Relocation – Dr. Reed indicated that there was currently a plan underway to move the Counselee to the Riverdale Office.
(4) Performance Evaluations - He was unaware that the Counselee had not received performance evaluations and he would look into this.
(5) Threat Assessment – Dr. Reed indicated that to have an outside contractor perform such an assessment is usually done at the recommendation of the Program Leader. He would have to ensure that the contractor performing the assessment was qualified to do so.
(6) Written Sexual Harassment Policy – Dr. Reed did not know how to address this. He stated that he could understand not wanting to be near someone who has harassed you but that the problem is that some people might know of individuals past history while others do not know.
(7) Compensatory Damages – Dr. Reed indicated that this was something he would need to discuss with his EEO Director but it would be helpful if he knew what amount of damages the Counselee was seeking.
(8) Attorney's Fees – Dr. Reed again indicated that this was something he would need to discuss with his EEO Director.

Dr. Reed stated that what the Counselee was seeking was possible however he would need to work each thing out with the people that the Counselee works with.

## CLOSURE:

The final interview was held on June 22, 1999. Based on the responses given by Dr. Reed, neither the Counselee nor her Attorney believed her issues would be resolved during the informal counseling process. This EEO Counselor provided the Counselee with the Notice of Final Interview as well as a copy of the Formal EEO Compliant form. (See Attachment #6) The Counselee was told that she had 15 days from the receipt of the notice to file a Formal EEO Complaint.

_____
Linda M. Smalls
EEO Counselor

6/28/99
Date

Exhibit 3A
Page 8 7 of 39