**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
**PENNY E. KRIESCH,**                         )
                                              )
              **Plaintiff,**                  )
                                              )
       **v.**                                 )          **Civil Action No. 05-2402 (RMC)**
                                              )
**THOMAS JAMES VILSACK,**                     )
**Secretary of Agriculture,**                 )
                                              )
              **Defendant.**                  )
_____            )

**OPINION**

After years of litigation and settlement discussions, Penny E. Kriesch, an

employee of the Department of Agriculture, and Thomas J. Vilsack, Secretary of Agriculture,

agreed to resolve this employment-discrimination case in August 2009.[1]  The parties stipulated

that in return for dismissing the case and releasing all claims, Ms. Kriesch, would receive, *inter*

*alia*, a sum of money, a promotion, and an appointment to a position at the University of

Maryland pursuant to a special cooperation agreement between Agriculture and the University.

Dissatisfied with Agriculture's implementation of the settlement agreement, Ms. Kriesch now

asks the Court to compel Agriculture to comply with her interpretation of the bargain.  For the

reasons set forth below, the Court concludes that Ms. Kriesch has received the full benefit of the

deal she struck and denies her motion.

---

[1] Mr. Vilsack, the present Secretary of Agriculture, is substituted for the original defendant,
Michael O. Johanns, pursuant to Fed. R. Civ. P. 25(d).  The Court refers to defendant as
"USDA" in this Opinion.

# I.  FACTS

## A.  Background Facts and Settlement Agreement

Ms. Kriesch, an African-American woman, had been employed by the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") for approximately seventeen years before filing the instant lawsuit on December 14, 2005.  Am. Compl. [Dkt. 9] ¶ 11.  She advanced claims of adverse personnel actions, hostile work environment, and denial of a promotion under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, deriving from "seven alleged discriminatory and/or retaliatory courses of conduct."  *See Kriesch v. Johanns*, 468 F. Supp. 2d 183, 185 (D.D.C. 2007).  The Court denied USDA's motion to dismiss, to transfer venue and/or for summary judgment on January 5, 2007, concluding that Ms. Kriesch had sufficiently stated her claims, that summary judgment prior to discovery was premature, and that a transfer of venue was inappropriate.  *See id.* at 185–90.  Following a period of discovery, two referrals to mediation, and repeated requests for more time to negotiate, the parties filed a Proposed Stipulation of Settlement and Dismissal on August 14, 2009, Dkt. 56, which the Court approved on August 20, 2009, Dkt. 57 ("Settlement Agreement").

In the Settlement Agreement, the parties agreed that the lawsuit would be dismissed with prejudice on certain terms set out in the agreement and in attachments thereto. *Id.* at 1.  The Court reviews those terms here only as needed to resolve Ms. Kriesch's motion. USDA agreed to pay Ms. Kriesch $220,000 immediately and, beginning August 16, 2009, to promote Ms. Kriesch "to the GS-15 step 6 level, as an [APHIS] Liaison in the Office of the Director, Plant Protection and Quarantine, Plant Health Programs" for a three-year period, after

which Ms. Kriesch would voluntarily resign.[2]  *Id.* ¶¶ 1–2.  USDA further assented to amending

Ms. Kriesch's employment records to reflect positive ratings for two years, to removing

reference to a suspension, and to providing her with a positive reference letter.  *Id.* ¶¶ 5–6, 10;

*see also id.*, Ex. C [Dkt. 57-3] (Reference Letter).

The primary subject of dispute is paragraph 3 of the Settlement Agreement, which

provided:

> 3.  <u>Intergovernmental Personnel Act Assignment</u>:  Defendant will
> detail Plaintiff, via the Intergovernmental Personnel Act ("IPA") to
> the University of Maryland, in an APHIS Liaison position with the
> University of Maryland effective . . . beginning August 16, 2009,
> and not to exceed August 31, 2012 . . . .  *See* Exhibit A.  In this
> capacity, Plaintiff will be responsible for supporting USDA
> interests in the University of Maryland College of Agriculture and
> Natural Resources, Plant Protection Center, and related programs.
> The IPA is further structured as follows:
>
> a.  The APHIS Liaison assignment is a three (3) years posting
> ending August 31, 2012 . . . .  If annual renewal of the IPA is
> required, USDA and the University of Maryland will obtain such
> renewal at the end of the first year and second year of the IPA.

---

[2] As of January 2012, GS-15, step 6 provided for an annual salary of $144,385 in the
Washington, D.C. locality area.  *See* Salary Table 2012-DCB, United States Office of Personnel
Management, available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-
wages/2012/general-schedule/dcb.pdf. (last accessed Mar. 20, 2013).  According to the USDA
APHIS website, Plant Protection and Quarantine "is a program within [APHIS that] safeguards
agriculture and natural resources from the entry, establishment, and spread of animal and plant
pests and noxious weeds into the United States of America; and supports trade and exports of
U.S. agricultural products."  "Plant Health," USDA APHIS, available at http://www.aphis.
usda.gov/plant_health/ (last accessed Mar. 22, 2013).  Plant Health Programs is a division within
the Policy Management division of Plant Protection and Quarantine.  *See* "PPQ Health
Organization Structure," USDA APHIS, available at http://www.aphis.usda.gov/
plant_health/structure/ (last accessed Mar. 22, 2013).  The Court refers to "USDA," "APHIS,"
and certain documents by acronym, as indicated, but uses the full names for Plant Protection and
Quarantine and Plant Health Programs to avoid confusion with Plant Protection Center, an entity
that plays an important part in the case.  *See Historic Boardwalk Hall, LLC v. C.I.R.*, 694 F.3d
425, 429 n.3 (3d. Cir. 2012) ("The alphabet-soup of acronyms in this case is perhaps beyond
parody, but the acronyms are a more efficient means of referring to various [entities] . . . so we
reluctantly fall into the soup.").

b.  As APHIS Liaison, Plaintiff will be accorded the university rank of Adjunct Professor with all appropriate privileges of University of Maryland afforded to similar persons of the rank of Adjunct Professor, provided that any such privileges do not conflict with Federal law, regulations, and guidance covering APHIS employees.  Plaintiff's tour of duty as APHIS Liaison will be governed by the Memorandum of Understanding between USDA and the University of Maryland.  *See* Exhibit B.

c.  As APHIS Liaison, Plaintiff will be provided with an appropriate office at the University of Maryland College of Agriculture and Natural Resources, including storage, and appropriate staff and material support including administrative help, office furnishing, computer and other electronic devices, printing and photocopy privileges and other reasonable assistance, supplies, and support, including funds to ensure the success of the program.

d.  During the term of the IPA, Plaintiff will be assigned work and supervised by the Dean of the College of Agriculture and Natural Resources of the University [of] Maryland (or his/her designee, which currently is the Department Chair of the College of Agriculture) who will be responsible for preparing her mid-year and annual performance ratings.  The APHIS Director of Plant Health Programs will serve as Plaintiff's agency contact and second-line supervisor of record.  Federal supervisory oversight will exist during Plaintiff's detail.  Plaintiff's position will be officially and permanently assigned to the Office of the Director, USDA, APHIS, Plant Protection Quarantine, Plant Health Programs, for all organizational actions.

e.  During the term of the IPA, Plaintiff will receive a GS-15 position description and will be assigned duties consistent with that description.

. . .

g.  If, for any reason, the IPA is terminated by USDA or the University of Maryland before August 31, 2012 . . . and Plaintiff has not at that time separated from USDA, she will be reassigned to USDA at the GS-15 level with GS-15 duties to a Washington, D.C. metropolitan area or Maryland location of the Agency's choosing, up until August 31, 2012 . . . .

h.  Plaintiff has no authority to cancel, withdraw, or rescind the IPA at any time prior to August 31, 2012 . . . but she may

4

voluntarily separate from USDA (and the APHIS liaison assignment) at any time during the period . . . .

In return for these promises from USDA, Ms. Kriesch agreed to "separate from APHIS no later than August 31, 2012" and never again seek employment with "APHIS or any other current Marketing and Regulatory Program agencies of USDA . . . after August 31, 2012." Settlement Agreement ¶¶ 6, 9.  She also agreed to dismiss all pending administrative complaints with prejudice and to release all claims against USDA.  *See id.* ¶¶ 12–13.

The parties further agreed that each would have a right to cure or respond to any allegation of a breach of the agreement within thirty days and that each would "make a good faith effort to resolve any dispute arising from or regarding [the agreement] before bringing the dispute to the Court's attention." *Id.* ¶ 23.  The Settlement Agreement, which is to be interpreted according to District of Columbia law, *id.* ¶ 26, also contained a merger clause, *id.* ¶ 17; a statement that the doctrine of *contra proferentem* would not apply, *id.* ¶ 19; and a requirement that each party "take such actions and [ ] execute such additional documents as may be necessary or appropriate to fully effectuate and implement" the agreement, *id.* ¶ 22.  By signing the document, Ms. Kriesch—who was represented by counsel—acknowledged that she had read the agreement, discussed it with her attorney, and understood it.  *Id.* ¶ 28.

A document titled "Assignment Agreement" (hereinafter "2009 IPA Agreement") and signed by Ms. Kriesch was attached as Exhibit A to the Settlement Agreement.  *See id.*, Ex. A [Dkt. 57-1].  The 2009 IPA Agreement recorded Ms. Kriesch's assignment to the University of Maryland College of Agriculture and Natural Resources from August 17, 2009, to August 16, 2011, pursuant to Title IV of the Intergovernmental Personnel Act of 1970 ("IPA"), 5 U.S.C. §§ 3371–76.  *See* 2009 IPA Agreement at 1–2.  It stated that Ms. Kriesch's "[a]ssignee position/title" would be "Special Assistant/Adjunct Profess[or]" and that her immediate

5

supervisor at the University of Maryland was Dr. William Kenworthy, Acting Department Chair

of the Department of Plant Science and Landscape Architecture. *Id.* at 1. The "Reason for

Mobility Assignment" stated, in relevant part: "We are seeking to establish an APHIS Liaison

position with the University of Maryland (UM [or UMd]) for the purpose of supporting USDA

interests at the UM College of Agriculture and Natural Resources, Plant Protection Center. Such

a position will enhance and advance programs of mutual interest between the parties including

joint project planning and implementation, extension and outreach, teaching other [sic]

authorized interests of the Plant Protection Center." *Id.* at 2. The "Reason for Mobility

Assignment" also listed ten "interests" that were repeated immediately below in the "Position

Description" section of the 2009 IPA Assignment. *Id.* The "Position Description" section stated

that Ms. Kriesch would "serve as [Plant Protection and Quarantine]'s principal liaison with the

University of Maryland College of Agriculture and Natural Resources" and would "facilitate

ongoing initiatives and further expand opportunities related to . . ."

> [S]tudent recruitment, retention, education and development; plant
> pest identification and related systematics studies; agricultural and
> environmental extension; implementing field programs;
> performing program monitoring, risk forecasting, and economic
> analyses; establishing linkages among various entities; facilitating
> the transfer of technologies between the UM, [Plant Protection and
> Quarantine], industry, and others; leveraging resources from
> diverse sources for plant pest management; international
> cooperation and development; and integrating the Plant Protection
> Center with Federal, State and inter- and intra-university programs.

*Id.*

Also attached to the Settlement Agreement as an exhibit was a lengthy

Memorandum of Understanding ("MOU") between the University of Maryland College of

Agriculture and Natural Resources and USDA Plant Protection and Quarantine, executed by

representatives of both parties in July 2009. *Id.*, Ex. B. The Court will summarize only the

relevant parts of the MOU here.  The MOU referenced an earlier memorandum, entered into by

APHIS and the University of Maryland in 2006, that had "outline[d] opportunities for

collaborative programs."  MOU at 2.  The 2009 MOU stated that its purpose was "to establish an

APHIS Liaison position with UM specifically responsible for supporting USDA interests in the

UM College of Agricultural [sic] and Natural Resources, Plant Protection Center (PPC), and

related programs" in order to "further enhance the already ongoing initiatives, provide impetus

for additional activities . . . , and further expand opportunities in new directions."  *Id.* at 1–2.

According to the MOU, "[t]he Plant Protection Center (PPC) is part of the campus of UM in

College Park, Maryland" and "is located in the College of Agriculture and Natural Resources."

*Id.* at 3.  Under the MOU, the University would "have the right to assess the qualifications and

suitability of any APHIS employee nominated to serve as the APHIS Liaison."  *Id.*  The MOU

did not state what title would be given to the APHIS Liaison; instead, it provided that

"appropriate UM policies and procedures governing liaison appointments may apply to the

extent that they do not conflict with the appropriate Federal rules."  *Id.* at 4.

### B.  Events After Execution of Settlement Agreement

Ms. Kriesch's complaints in her post-settlement filings pertain exclusively to the

terms and conditions of her detail at the University of Maryland.  She does not assert that USDA

has breached any other portion of the Settlement Agreement.  *E.g.*, Reply [Dkt. 67] at 1 (arguing

that USDA failed to "ensure her a title of Adjunct Professor with the University of Maryland;

implement the Plant Protection Center, for which she was supposed to be working; and provide

adequate funding for her position").  Accordingly, it is apparent that Ms. Kriesch received a

lump sum payment of $220,000; she was promoted to GS-15, step 6 and paid accordingly until

August 31, 2012; she was appointed as an APHIS Liaison to the University of Maryland; her

employment records were properly amended; and she received a reference letter.  *Id.* at 4

("APHIS indeed promoted Ms. Kriesch, paid her the lump sum, gave her the reference letter, and amended her personnel file . . . .").

### 1. Title Issues

The parties' August 2009 conciliation was regrettably short-lived.  Ms. Kriesch began expressing discontent with USDA's implementation of the Settlement Agreement almost immediately.  She complained by letter to Brandi Peters of the Office of General Counsel of USDA about various issues three times before 2009 ended.  Pl. Mot, Ex. 5[3] [Dkt. 63-5] at 51–55 (Jan. 4, 2010 Letter from Brandi Peters ("Jan. 4, 2010 Letter")); *see also* Pl. Mot., Ex. 4 [Dkt. 63-4] (collection of e-mails from late 2009 regarding Ms. Kriesch's complaints).[4]  Most relevant for present purposes is that the University of Maryland advised USDA on September 23, 2009, that it could not appoint Ms. Kriesch as an Adjunct Professor because Ms. Kriesch did not have a terminal degree in a relevant field.[5]  *See* Jan. 4, 2010 Letter at 51–52.  The University stated that its policy, promulgated by the University's Faculty Affairs Office, could not be reconsidered.  *Id.* at 52.  Prior to advising USDA of this issue, Dr. Kenworthy had submitted Ms. Kriesch's title to the Faculty Affairs Office as "Faculty Research Assistant," a position "for faculty with duties

---

[3] Plaintiff's Exhibits 4 and 5, Dkts. 63-4 and 63-5, are both amalgams of various e-mails, letters, and documents.  The Court refers to pages by the Bates numbers in the lower right corners of the pages.

[4] These e-mails reflect that Ms. Kriesch was profoundly skeptical of USDA's efforts to comply with the Settlement Agreement as early as September 24, 2009, when she wrote an e-mail titled "Univ offer withdrawn/changed" that stated, in part, "We make agreements—I try to leave the agency quietly—but I believe someone sabotaged this one."  Pl. Mot., Ex. 4 at 48; *see also id.* at 49–50 ("I was falsely told that I could not qualify for another title by UMD—but subsequently learned that this is not true—either.  What that means to me—is that the waters have been sullied—and despite my good intentions, my role will be decimated as I am not even given position type [sic] at the University, essential to teach or develop curriculum—which is what you want me to do.").

[5] The January 4, 2010 Letter gives examples of a Ph.D. or J.D.  Ms. Kriesch has not argued that she possesses a terminal degree in a relevant field.

primarily in research, scholarship, or artistic creativity."[6]  *Id.* at 52–53 (citing University of

Maryland Policy on Appointment, Promotion and Tenure of Faculty § I.B).

        In the January 4, 2010 Letter, Ms. Peters advised Ms. Kriesch that the Agency had

"no control, authority, or oversight over the Faculty Affairs Office at UMD and its decisions to

approve/deny employees' titles at UMD."  *Id.* at 53.  However, USDA was "consistently

attempt[ing] to work with UMD, as well as with [Ms. Kriesch], to reach an amenable

resolution," including proposing alternative titles for her while on detail, such as "Lecturer,"

"Faculty Research Associate," "Director," and "Coordinator."  *Id.*; *see also* Pl. Mot, Ex. 4 at 1

("[USDA] was interested to get your opinion of establishing a working title at UMD as 'Director

& Lecturer of APHIS Plan Bio-security Program,' 'Director & Lecturer of APHIS Plant

Protection and Quarantine Program,' or some other variation.").  The January 4, 2010 Letter also

stated, without further detail, that Ms. Kriesch had expressed concern about her "position

description/detail duties."  Jan. 4, 2010 Letter at 53.  USDA responded by advising Ms. Kriesch

that USDA was not "responsible for assigning [Ms. Kriesch] duties pursuant to [her] detail" and

that Ms. Kriesch should "coordinate with Dr. Kenworthy to discern what duties are relevant to

[the] detail."  *Id.*

        The University of Maryland ultimately gave Ms. Kriesch the title of Lecturer.  *See*

Opp., Ex. 1 [Dkt. 65-1] at 1–3 (listing Ms. Kriesch as a Lecturer on a list of "Affiliates,

Adjuncts, and Lecturers" in the Plant Science and Landscape Architecture Department); *accord*

Reply, Ex. 1 [Dkt. 67-1], Kriesch Decl. ¶ 8.

---

[6] In a newsletter to the University of Maryland Department of Plant Science and Landscape Architecture, Dr. Kenworthy wrote: "We are also fortunate to have Ms. Penny Kriesch from USDA APHIS join [the Department of Plant Science and Landscape Architecture] in a special appointment as faculty liaison.  Penny is working with our Department and assisting in course instruction and development of student internships, raising career awareness, and facilitating faculty collaborations with APHIS personnel and programs."  Pl. Mot., Ex. 4 at 38.

### 2. Issues Regarding Extension of IPA

From all appearances, a period of serenity ensued between sometime in early 2010 and late 2011.  A January 2011 newsletter from the University's College of Agriculture and Natural Resources touted Ms. Kriesch's receipt of a Native American Outreach Award from USDA.  *See* Opp., Ex. 2 [Dkt. 65-2] at 2.  The newsletter also stated: "Since being assigned to work as a liaison within [the Department of Plant Science and Landscape Architecture], Ms. Kriesch has integrated outreach activities between USDA APHIS and the UM Office of Multi-Ethnic Student Education, been instrumental in creating the Plant Health lecture series, and provided internship opportunities with APHIS for students.  She has also collaborated with Dr. Bill Kenworthy and AGNR representatives in establishing the Center for Plant Health and Biosecurity.  Stay tuned for more information on the grand opening of the Center in the next issue of [the Department of Plant Science and Landscape Architecture] newsletter."  *Id.*  USDA has also submitted a declaration from Doctor Michael Watson, present Executive Director of Plant Health Programs at APHIS, who stated that during her time at the University, Ms. Kriesch "(1) organized a yearly lecture series at the University; (2) led the [Plant Protection and Quarantine] effort to attract students into [its] internship program from UMD and other Maryland universities; (3) led [Plant Protection and Quarantine]'s participation in the AgDiscovery Program; (4) coordinated [Plant Protection and Quarantine]'s efforts to participate in UMD's yearly "Maryland Day" event; (5) served as a liaison between [Plant Protection and Quarantine] and UMD on related issues; (6) and other issues related to UMD-[Plant Protection and Quarantine] interactions."  Opp., Ex. 3 [Dkt. 65-3] (Watson Decl.).  According to Dr. Watson, Dr. Kenworthy was "very pleased with Ms. Kriesch's work at UMD."  Watson Decl. ¶ 12.

Conflict again reared its head in late 2011 when the original 2009 IPA Agreement covering Ms. Kriesch's detail from USDA to Maryland expired and USDA attempted to get Ms. Kriesch to sign an extension to cover the rest of her agreed-upon three-year detail.  Although the parties dispute the legal significance of the events that took place, they substantially agree as to the relevant facts.  *Compare* Pl. Mot., Ex. 5 [Dkt. 63-5], at 1–48 (documentary evidence submitted by Ms. Kriesch), *with* Watson Decl. & Exs. (setting forth many of the same e-mails and facts).

Sometime in late 2011, USDA proposed an extension from the "present" to August 31, 2012—the ending date set forth in the Settlement Agreement.[7]  *See* Pl. Mot., Ex. 5 [Dkt. 63-5] at 45–48 ("First Proposed IPA Extension").  The First Proposed IPA Extension listed "Employee's Position Title" for the "Position Currently Held" as "Special Assistant to [Plant Health Programs] Dir[ector]."  *Id.* at 45.  The detail position would be "Lecturer/Executive Liaison."  *Id.*  The "Reason for Mobility Assignment" stated: "This is a renewal and continuation of the current [IPA] for a liaison position with the University of Maryland for the purpose of supporting USDA interests at the UMD College of Agriculture and Natural Resources, Plant Protection Center."  *Id.* at 46.  In the section titled "Position Description," the First Proposed IPA Extension stated:

> A copy of the position description is attached.  The incumbent serves as [Plant Protection and Quarantine]'s principal liaison with the University of Maryland College of Agriculture and Natural Resources.  The incumbent will facilitate ongoing initiatives and further expand opportunities related to: [S]tudent recruitment, retention, education and development; [p]lant pest identification and related systematics studies; agricultural and environmental extension; implementing field programs; performing program monitoring, risk forecasting, and economic analyses; establishing

---

[7] The final page of the First Proposed IPA Extension stated that the extension would run from "11/01/2011 to 08/31/2011."  The latter "2011" was a typographical error for 2012.

> linkages among various entities; facilitating the transfer of technologies between the UMD, [Plant Protection and Quarantine], industry, and others; leveraging resources from diverse sources for plant pest management; international cooperation and development; and integrating the Plant Protection Center with Federal, State and inter- and intra-university programs.

*Id.*

The date on which the First Proposed IPA Extension was provided to Ms. Kriesch is unclear from the record, but she had it no later than November 16, 2011, when she sent an e-mail to Dr. Kenworthy, certain APHIS staff, and USDA agency counsel stating, "I have reviewed the proposed IDP and must offer the following. Special Assistant positions are not automatically GS-15s in rank. Should I sign this IDP with the newly enumerated duties and title (no position description is attached), I would have to take a 3 level reduction in pay. I am sure that this was not your intent, but it would be the outcome. I have served as a chief classifier for U.S. Navy, FDA and USDA APHIS and so am confident of my assessment." *Id.* at 44; *accord* Watson Decl. ¶¶ 7–8 & Ex. 1 (copy of same e-mail). On November 21, 2011, Ms. Kriesch sent an additional e-mail, stating: "Sorry to be so specific, but we are looking at the UM program and what it incorporates since the Plant Protection Center never was established directly or virtually. The Center they approved, the Center for Plant Health and Biosecurity, calls for leadership from a PhD—which is beyond me—but, I expect it will all get worked out." Watson Decl. ¶ 9 & Ex. 2 (copy of e-mail).

According to USDA, on December 12, 2011, Ms. Kriesch met with Doctor Michael Watson, then Associate Executive Director of APHIS Plant Health Programs, Victor Harabin, Acting Executive Director of APHIS Plant Health Programs, and Dr. Kenworthy of the University of Maryland. Watson Decl. ¶ 10. During the meeting, Ms. Kriesch "express[ed] her view that there had been a lack of funding for the Plant Protection Center[ ] and that she believed

her services were no longer needed as the detailee" from APHIS to the University of Maryland.
*Id.* "Ms. Kriesch announced that she was relinquishing her office at UMD" and would begin

working at APHIS Headquarters beginning in January 2012. *Id.* However, the meeting

attendees, including Ms. Kriesch, agreed that Ms. Kriesch should remain at the University, as

there were four "ongoing activities" that APHIS wished to coordinate: "(1) internships, (2) Ag-

Discovery program[,] (3) lecture series, and (4) recruitment/job fairs." *See id.* ¶ 11.  Dr.

Kenworthy "hoped that [Ms. Kriesch would] continue to work on all of the other tasks she had

done" since beginning her detail in 2009. *Id.* ¶ 12.  Accordingly, "[t]he meeting concluded with

agreement that . . . APHIS would update the IPA for Ms. Kriesch's involvement with the

University." *Id.* ¶ 11.

On December 22, 2011, Mr. William E. Thomas, Acting Director of Plant Health

Programs, sent Ms. Kriesch a "Letter of Instruction" that directed her to "[r]esume [her] duties"

at the University of Maryland pursuant to the Settlement Agreement and 2009 IPA Agreement,

"with the exception of 'Integration of the Plant Protection Center with Federal, State, and inter

and intra university programs.'" Pl. Mot., Ex. 5, at 30–33 (First Letter of Instruction); *see also*

Watson Decl. ¶¶ 13–16 & Ex. 3 (copy of same letter).  The First Letter of Instruction also

required Ms. Kriesch to advise Dr. Watson of her "work status and location, by 9:00 AM on

January 3, 2012" and to "[s]ign the OF69 IPA Assignment Agreement Extension (copy enclosed)

. . . as the designated APHIS detailee to the UMD," and return it by January 10, 2012.  First

Letter of Instruction at 30.  The First Letter of Instruction also stated:

> The fact that APHIS has not funded the Plant Protection Center at
> the UMD has no bearing on your obligation to perform the other
> enumerated duties under the [Settlement Agreement and 2009 IPA
> Agreement], such as student recruitment, retention, education, and
> development, and other related duties that appear in Part 6 of the
> enclosed IPA. Further, the fact that you do not possess a PhD is

> irrelevant with respect to whether you are paid at and perform duties consistent with the OS-IS level for the duration of the agreement. Your lack of a PhD only has bearing on whether the UMD was able to confer the title of Adjunct Professor for the duration of your appointment, which we subsequently learned the university's rules did not permit. Irrespective of whether your title was Adjunct Professor or Lecturer/Executive Liaison to UMD, . . . [y]our announcement on December 12, 2011, that you intended to abandon your detailed position at the UMD is both inappropriate and unjustified, as well as prejudicial to the interests of [APHIS], as it jeopardizes the relationship with a key cooperator.

*Id.* at 31. Attached to the First Letter of Instruction was an unsigned IPA Extension Agreement ("Second Proposed IPA Extension") that was identical to the First Proposed IPA Extension except for the dates above "employee signature" reading "From 01/01/2012 To 08/31/12" in the new version. *Id.* at 40.

The First Letter of Instruction and Second Proposed IPA Extension did not mollify Ms. Kriesch. She responded by e-mail dated December 30, 2011, stating that Mr. Thomas had "no jurisdiction or right" to issue the Letter of Instruction because she was "performing under a District Court settlement agreement" and that her "single point of contact for Federal supervision" was Rebecca Bech, USDA APHIS Plant Protection and Quarantine Deputy Administrator. Pl. Mot., Ex. 5, at 28–29 ("Dec. 30, 2011 E-mail"); *see also* Watson Decl. ¶ 17 & Ex. 4. She raised five specific concerns with the Letter of Instruction, stating that "the program has never been funded and as such, does not exist . . . Am I to sit in an empty office at the University of Maryland, with no computer . . . with no duties? The alternate work functions you described are either nonexistent, clerical in nature, below grade or assigned to other persons." Dec. 30, 2011 E-mail at 28. She further wrote that she was "not required by

settlement agreement provisions to sign a new/changed IPA." *Id.* at 29.  She concluded that she was "exercising her right" to provide a "duressed signature."[8]  *Id.*

Ms. Kriesch did not sign the Second Proposed IPA Extension, and she reported to APHIS instead of the University of Maryland on January 3, 2012.  Watson Decl. ¶¶ 21–22.  By an eight-page letter dated January 26, 2012 ("Second Letter of Instruction"), Doctor Philip Berger, Acting Director of APHIS, reiterated and reaffirmed the contents of the First Letter of Instruction.  *Id.*; *see also id.*, Ex. 5 (Second Letter of Instruction); *accord* Pl. Mot., Ex. 5, at 17–23 (Second Letter of Instruction without page eight).  The Second Letter of Instruction rebutted each of Ms. Kriesch's concerns.  Particularly pertinent to the instant motion is the following passage from page six:

> [W]hile I realize you cannot integrate a plant protection center with Federal, State, and University programs when such a center has yet to be created, you can certainly work with UMD personnel and APHIS to produce a strategic plan that would address its creation: how it would be funded; its mission, vision, and values; organizational structure, and staffing, etc. By creating such a document collaboratively with UMD officials and [Plant Protection and Quarantine], you would be making a significant long term contribution to both the UMD and APHIS, consistent with the principles of cooperation between the parties as embodied in the MOU.
>
> We believe you are well qualified to produce such a plan for the plant protection center. Your expertise in the area of strategic planning and familiarity with the center and your problem solving ability has been previously touted by former [Plant Health Programs] Director Alan Green in the letter of Introduction and Recommendation he provided to you on August 3, 2009. In that document he recognized that one of your many assignments and

---

[8] Around this time, Ms. Kriesch apparently suffered a "traumatic head injury" that required "neurocognitive assessment, treatment and review."  Dec. 30, 2011 E-mail at 29.  The exact circumstances of the injury are not apparent from the record, although both parties refer to it on several instances in later communications.  Ms. Kriesch has not asserted that this injury was in any way relevant to the parties' performance under the Settlement Agreement, although she at times noted that she would be requesting accommodations upon her return to work.

accomplishments included serving as the UMD Plant Protection Center start-up liaison (see assignment #188). Hence, it is expected that upon your return to the UMD you will work collaboratively with UMD officials and APHIS to produce such a document, and that you are further instructed to do so.

*Id.* at 6.  Dr. Berger further responded to Ms. Kriesch's contention that USDA was asking her to sign a "new/changed IPA" by clarifying that she was "instructed to sign an Extension of the original [2009] IPA [Agreement]" pursuant to paragraph 3(a) of the Settlement Agreement.  *Id.* at 7.

Dr. Berger stated that he had "decided not to charge [Ms. Kriesch] AWOL for the timeframe since January 3, 2012," when she was reporting to APHIS instead of the University.  *Id.*  He also wrote: "You are hereby instructed to report to UMD and resume your Liaison duties effective Monday, January 30, 2012.  Your failure to sign the IPA Extension Agreement, failure to follow these instructions, or failure to report as instructed may result in your time being record as AWOL, and may subject you to corrective action . . . ."  *Id.*

Ms. Kriesch was not placated by the Second Letter of Instruction.  By e-mail dated January 26, 2012, she wrote to, *inter alia*, Dr. Berger, stating that she "was not offered a renewal of the same IPA" but instead "was ordered to sign an IPA with different title, functions, organization and substantially lower graded duties . . . to cover up the fact that the duties and work organization as originally committed to by APHIS in the settlement agreement never existed, nor could they ever exist."  Pl. Mot., Ex. 5 at 16.  Ms. Kriesch also asserted that "there never was (nor will there ever be) a Plant Protection Center at University of Maryland."  *Id.*  She concluded that she "[did] wish to follow Agency direction" but would "need a few days to review the 59 paged memo" as she had suffered "head trauma" that "damaged her visual cortex" resulting in "one side of [her] brain having a faster 'clock speed'[ ] than the other."  *Id.*

However, Ms. Kriesch wrote that she anticipated a "[f]ull evaluation" by mid-February,

characterizing her injury as a "temporary physical disability." *Id.*

Ms. Kriesch continued penning additional missives. One, sent to Ms. Peters and

Dr. Berger, among others, was dated February 2, 2012, and was titled "Continued Harassment."

Pl. Mot., Ex. 5 at 15. Ms. Kriesch wrote:

> I would like to add to my EEO complaint—continued retaliatory
> and now, racial harassment and discrimination that is affecting my
> health (known disability) via threats of discipline and removal
> based on false charges of AWOL/job abandonment by Dr. Phil
> Berger. It is as if APHIS [Plant Protection and Quarantine]
> managers are taking turns—gangland style—to falsely accuse and
> insult my personage. In the old plantation days, plantation owners
> would find an uppity slave and via group, chase them in the dark,
> hunted by dogs. It was to improve the prowess of plantation slave
> masters in controlling their "property."
>
> Tell me how is this much different from what Dr. Berger, et al, are
> perpetrating against me? I have but a brief time left—why so
> determined to destroy not only my career in APHIS—but career
> opportunities once I leave the Agency. Is an EEO complaint
> against APHIS a life sentence . . . ?

*Id.*

That same day, Ms. Kriesch sent an additional e-mail to, *inter alia*, Dr. Berger

and Ms. Peters, titled "Response to Your Threatening Letter Citing Removal." Pl. Mot., Ex. 5, at

11–14. Attached was a three-page letter, addressed to Dr. Berger, again reiterating her

contentions regarding USDA's non-compliance with the Settlement Agreement. Ms. Kriesch

reprised her allegation that USDA was committing a "retaliatory act" against her by threatening

to discipline her if she did not sign a "significantly different" IPA. *Id.* at 12. She contended that

she had "*never* stated that [she] was abandoning [her] position" but "did state [that] [Plant

Protection and Quarantine] management should make some decisions regarding [her] position

and [Plant Protection and Quarantine]'s relationship with the University of Maryland." *Id.* Ms.

Kriesch further asserted that "USDA lied about what the IPA would entail" and was asking her

to "concur with a second agreement [ ] to cover-up [sic] a major noncompliance factor in the

settlement agreement." *Id.* at 13–14.  She complained that "USDA APHIS [Plant Protection and

Quarantine] has not funded any and all activities related to the IPA," *id.* at 14, and concluded:

"What is really occurring here is racist workforce planning. I realize now . . . that reductions are

forthcoming. . . . You already have your 12% representation of Blacks and so need no more.  I

will raise this quota system in the Courts—for all USDA employees—as I believe race-based

retention is your personal and organizational intent," *id.*

      USDA then sent a Third Letter of Instruction to Ms. Kriesch, signed by Dr.

Berger, on March 7, 2012.  Watson Decl. ¶ 23; Watson Decl. Ex. 6 (Third Letter of Instruction);

*accord* Pl. Mot., Ex. 5 at 5–8 (Third Letter of Instruction).  In relevant part, Dr. Berger directed

that Ms. Kriesch should:

> 1.   Maintain a physical presence at the UMD College of
> Agriculture and Natural Resources for 80% of your work week
> . . . [t]he remaining 20% of your time can be spent at APHIS
> headquarters in Riverdale as needed.  . . . You are to do this within
> two business days . . . .
>
> 2.  Commence work on a strategic plan in concert with UMD and
> APHIS officials for the development of a plant protection center,
> as instructed to do in the January 26, 2012 letter to you . . . and
> report the progress on such a plan in the reports referenced below.
> Your duties should also include, among other things, the
> continuation of a student intern program for 2012.
>
> 3.  Submit via e-mail, written progress reports to . . . Dr. Michael
> T. Watson, at the end of each pay period, detailing your activities
> that are described in, and consistent with your position description
> that was provided to you on January 26, 2012.

Third Letter of Instruction at 1–2.

      The third time was not the charm.  Ms. Kriesch responded on March 8, 2012, with

a lengthy e-mail sent to, *inter alia*, Drs. Watson and Berger.  Pl. Mot., Ex. 5 at 3–4.  Her

allegations therein were much the same as discussed at length above.  She alleged that "[t]he University, due to USDA APHIS [Plant Protection and Quarantine] [Plant Health Programs] not providing agreed-upon funding for physical facilities, has disconnected my phone, deactivated my voice mail account, unhooked my computer connections, deleted my e-mail account, removed my name from the door and has asked that I vacate the premises." *Id.* at 3.  She also stated that "[t]he University of Maryland *refused* to establish a Plant Protection Center. . . . Instead, they created (with my facilitation) via formal University Charter, a Center for Plant Health and Biosecurity.  USDA APHIS [Plant Protection and Quarantine] [Plant Health Programs] concurred with this new organizational entity . . . ." *Id.*  In addition, Ms. Kriesch wrote: "I realize you are just trying to tally up disciplinary actions to fire me prior to the end of the settlement agreement and strengthen the agency case that I am a wayward African American female." *Id.* at 4.

The record does not reveal that Ms. Kriesch ever signed the Second Proposed IPA Extension.  Attached to Ms. Kriesch's motion is an e-mail chain containing two e-mails, one from Susan Burk of the University of Maryland and the other from Ms. Kriesch.  The first in time, sent by Ms. Burk to Ms. Kriesch on May 7, 2012, stated: "I received your voice mail message regarding APHIS personnel coming to [the Department of Plant Science and Landscape Architecture] . . . to pick up the remaining boxes from your office.  I also heard you say that you have given the office key to your supervisor. . . .  I know we have been so glad to have you here at [the Department of Plant Science and Landscape Architecture].  I am saddened that your time with us is ending."  Pl. Mot., Ex. 5 at 1.  Ms. Kriesch then forwarded Ms. Burk's e-mail to Dr. Watson and others, stating: "The University of Maryland—due to USDA APHIS [Plant Protection and Quarantine] not funding any program activities, has closed down my office. This

is another violation of the settlement as the full term of the IPA was to have been through

August.  Also—I am on disciplinary letter with directions to be in an office for 80% of the time

at the University—when the University indicates I should be there 0%."  *Id.*

On the other hand, According to USDA, "[a]fter Ms. Kriesch indicated . . . that she no longer had

office space at the University, [USDA] indicated to Ms. Kriesch that she could continue to

perform her duties while residing in the APHIS Riverdale facility through August 2012."

Watson Decl. ¶ 25.  Ms. Kriesch does not contend otherwise.

### C. Procedural History—Motion to Enforce Settlement Agreement

On August 20, 2012, Ms. Kriesch filed a *pro se* Complaint against the Secretary

in a new case, Civ. no. 10-1417 (RMC) ("new case"), alleging that the USDA "fail[ed] to

comply with provisions of the settlement agreement."  Compl. [Dkt. 1] (Civ. no. 10-1417) at 1.

The Court referred the new case to United States Magistrate Judge Deborah Robinson for case

management.  May 4, 2011 Order [Dkt. 5] (Civ. no. 10-1417).  Magistrate Judge Robinson

presided over the new case through filing of an Amended Complaint and briefing of a motion to

dismiss.  In May 2012, Magistrate Judge Robinson referred the new case to mediation through

the Office of the Circuit Executive and stayed the pending motion.

When mediation failed, this Court held a status conference in this case on July 19,

2012, and entered the parties' joint proposed scheduling order shortly thereafter, providing for

limited discovery and cross-motions to enforce the Settlement Agreement.  *See* Minute Order

dated July 31, 2012.  The Court also dismissed the new case at the parties' joint request.  *See*

Minute Order dated July 19, 2012 (Civ. no. 10-1417).

Ms. Kriesch filed her Motion to Enforce Settlement Agreement on November 30,

2012.  Pl. Mot. [Dkt. 63].  USDA filed its opposition on January 14, 2013, and affirmatively

opted not to file a cross-motion to enforce.  Opp. [Dkt. 65].  Ms. Kriesch filed her reply on

February 9, 2013.  [Dkt. 67].  The matter is now ripe for decision.

## II.  LEGAL STANDARD

Federal district courts have authority to enforce settlement agreements entered

into by the litigants before them.  *Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d

483, 493 (D.D.C. 2005).  "An agreement to settle a legal dispute is a contract[,] . . . [and] [t]he

enforceability of settlement agreements is governed by familiar principles of contract law."

*Village of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C. Cir. 1982).  An action to enforce a

settlement agreement is, at bottom, an action seeking the equitable remedy of specific

performance of a contract.  *Samra,* 355 F. Supp. 2d at 493.  Therefore, a district court may

summarily enforce a completed settlement agreement—i.e., one as to which there is no dispute

as to "the material facts concerning the existence or terms of an agreement to settle."  *See Wilson

v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995); *see also Autera v. Robinson*, 419 F.2d 1197, 1202–

03 (D.C. Cir. 1969).

## III.  ANALYSIS

Ms. Kriesch alleges that USDA materially breached the Settlement Agreement in

two ways.  First, USDA failed to secure for her the title of Adjunct Professor at the University of

Maryland, and second, USDA never established or funded a Plant Protection Center at the

University.  Pl. Mot. at 12.[9]  Ms. Kriesch asserts that these two factors "were essential to the

parties' negotiations" and argues that USDA's alleged breaches were material, justifying

rescission of her termination from USDA, with back pay to August 31, 2012.  *Id.* at 14, 17; *see*

---

[9] Although she earlier expressed other claims of noncompliance, Ms. Kriesch only pursues her
complaints regarding her title and the Plant Protection Center here, and any other claims are
deemed waived.

*also* Reply at 16 ("[USDA] is not permitted to demand Ms. Kriesch's performance in the form of her resignation.").

### A.  Governing Law—Breach of Contract and Materiality

The Settlement Agreement is construed under the law of the District of Columbia as agreed to by the parties.  *See* Settlement Agreement ¶ 26.   The District of Columbia applies the objective theory of contracts, meaning that "the language of the agreement as it is written governs the obligations of the parties unless that language is unclear or there is fraud, duress, or mutual mistake." *Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1012 (D.C. 2000) (finding settlement agreement ambiguous); *see also Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 190 (D.C. 2009) ("No matter what [the tenants] may have had in mind, the [c]ourt must construe [the parties'] rights on the basis of the contract as written." (citing *Simpson Bros. v. District of Columbia*, 73 F. Supp. 858, 859 (D.D.C. 1974)). "When interpreting a contract and determining whether it is ambiguous, '[the Court must] examine the document on its face, giving the language used its plain meaning.'" *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)). "If, however, 'the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court—after admitting probative extrinsic evidence—must determine what a reasonable person in the position of the parties would have thought the disputed language meant.'" *Id.* (quoting *In re Bailey*, 883 A.2d 106, 118 (D.C. 2005)).

Even if the Court finds the existence of a breach, it must consider whether that breach was material because "only a material breach would permit rescission of the Settlement Agreement and reinstatement of plaintiff's claims." *America v. Mills* ("*America II*"), 714 F. Supp. 2d 88, 100 (D.D.C. 2010) (citing *Lutz v. U.S. Postal Serv.*, 485 F.3d 1377, 1381 (Fed. Cir. 2007)), *aff'd*, 643 F.3d 330 (D.C. Cir. 2011). "A breach is material only if it relates to a matter of

vital importance or if it goes to the essence [of the contract] and frustrates substantially the purpose for which the contract was agreed to by the injured party." *America II*, 714 F. Supp. 2d at 100 (internal citations and quotation marks omitted; alteration in original). When "the facts are undisputed[,] the determination of whether there has been material non-compliance with the terms of a contract necessarily reduces to a question of law." *Lutz*, 485 F.3d at 1381.

Courts consider a range of factors in evaluating whether a breach was material, including "the extent to which plaintiff will be deprived of the benefit which he reasonably expected under the contract; the extent to which the plaintiff can be adequately compensated for the part of that benefit of which he will be deprived; the extent to which the defendant will suffer forfeiture; the likelihood that the defendant will cure his failure, taking account of all the circumstances including any reasonable assurances;[ ]the extent to which the behavior of the defendant comports with standards of good faith and fair dealing[;]" "the extent to which the contract has been performed at the time of the breach[;] whether the breach was willful rather than by negligence or by extraneous circumstances[;] and whether the breach was quantitatively serious." *See America v. Preston* ("*America I*"), 468 F. Supp. 2d 118, 125 (D.D.C. 2006); *Greyhound Lines, Inc. v. Bender*, 595 F. Supp. 1209, 1224 (D.D.C. 1984) (internal quotations and citation marks omitted); *see also The Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 109 (D.D.C. 2009) (listing factors).

## B.  Parties' Arguments

Not receiving the title of Adjunct Professor at the University of Maryland was a material breach, Ms. Kriesch asserts, because it was "virtually her sole motivation for signing the [Settlement] Agreement."  Reply at 4.[10]  She asserts that "APHIS was fully aware of the

---

[10] Attached to Ms. Kriesch's reply brief is her affidavit, stating that she "would not have signed the Agreement had [she] known that [she] would be assigned to UMd as a Lecturer, rather than

importance" of that title to her but "it had never received any assurance from the University that [she] could encumber that position." *Id.* at 5–6.  Emphasizing that she "notified APHIS within weeks of her signature that the University would not grant her" Adjunct Professor status, Ms. Kriesch faults USDA for not "work[ing] out another IPA—with American University, for example," where Ms. Kriesch had been an Adjunct Professor previously—that "would have enabled the terms in the [Settlement] Agreement to be honored." *Id.* at 6.  USDA responds that it "did not become aware until *after* [Ms. Kriesch] began the IPA that University policy required persons holding the title of 'Adjunct Professor' to possess a Ph.D." and that it "promptly conferred with the University in an attempt to find an equivalent title," settling on "Lecturer." Opp. at 11.  Noting that Ms. Kriesch has not argued "that she was denied any duties or privileges on account of holding the 'Lecturer' title," USDA responds that Ms. Kriesch's "suggestion that the role of 'Adjunct Professor' formed the heart of the benefit she expected to receive is contradicted by the terms of the [Settlement Agreement]."  Opp.  at 11–12.  USDA points out that the Settlement Agreement provided that USDA could terminate the IPA at any time for any reason and did not state that Ms. Kriesch would "be detailed to the University of Maryland or be appointed to an 'Adjunct Professor' position for any fixed period of time during [those] three years."  *Id.*

Ms. Kriesch also claims that the existence of a Plant Protection Center was the "essence" of her bargain with USDA but that the USDA knew it "did not exist" and had "no plans" for it.  Pl. Mot. at 8, 10.  She alleges that USDA's conduct "falls far short of 'fair dealing'" because it "either knew . . . or should have known . . . material facts about the viability of the [Settlement] Agreement but withheld that information from Ms. Kriesch."  *Id.* at 10.  As

as an Adjunct Professor" and that "the ability to bring the [Plant Protection Center] to fruition . . . was critical to [her] motivation."  Aff. Penny Kriesch, Reply Ex. 1 [Dkt. 67-1] ¶¶ 8–9.

to the Plant Protection Center, USDA argues that "'integrating a Plant Protection Center' at the University of Maryland was one of the many duties for which the APHIS Liaison was responsible under the MOU, which included work in the area of student recruitment, retention, education and development." Opp. at 13. According to USDA, "the reference to funding in the Settlement Agreement . . . was not specific to the Plant Protection Center, but rather an indication that [Ms. Kriesch] would be given necessary funds to ensure the success of her detail." *Id.* Furthermore, according to USDA, the Plant Protection Center provision was not material because "the thrust of the IPA provision . . . was to provide for [Ms. Kriesch's] employment with APHIS in some capacity up until August 2012, but it did not mandate the nature of the position [Ms. Kriesch] was to occupy, other than that [she] would be assigned 'at the GS-15 level with GS-15 duties.'" *Id.* at 14. USDA asserts that Ms. Kriesch, despite not having authority to do so under the Settlement Agreement, "made the unilateral decision that she would no longer serve in the IPA as of January 2012," which USDA then accommodated by "permitting [Ms. Kriesch] to return to APHIS" until she left USDA in August. *Id.* at 14–15.

### C. Whether a Material Breach Occurred

#### 1. Breach

Before reaching the question of materiality, the Court must determine first whether USDA breached the Settlement Agreement. It bears emphasizing at the outset that Ms. Kriesch concedes that USDA satisfied the lion's share of the settlement. Ms. Kriesch received a lump-sum payment of $220,000, a promotion to GS-15 step 6 and three years' pay at that level, an appointment as APHIS Liaison to the University of Maryland, an amendment of her employment records, and a reference letter. *See* Reply at 4. Her concession alone may be enough for the Court to find that USDA substantially performed its obligations. *See Burtoff v. Burtoff*, 418 A.2d 1085, 1090 (D.C. 1980) (recognizing in marital-agreement case that District of

Columbia recognizes doctrine of substantial performance beyond typical cases involving real estate construction).  As set forth below, however, the Court concludes that USDA did not materially breach the Settlement Agreement in either way Ms. Kriesch claims.

USDA concedes that it was unable to satisfy the Settlement Agreement's provision for Ms. Kriesch's title at the University of Maryland.  *See* Opp. at 11 (arguing that USDA "promptly conferred with the University in an attempt to find an equivalent title that would provide [Ms. Kriesch] with the same benefits as she would have enjoyed with an 'Adjunct Professor' title").  The Settlement Agreement provided in paragraph 3(b) that "[a]s APHIS Liaison, [Ms. Kriesch would] be accorded the university rank of Adjunct Professor with all appropriate privileges of University of Maryland afforded to similar persons of the rank of Adjunct Professor."  Notwithstanding this language, Ms. Kriesch's title was ultimately set at Lecturer.  Thus, as a matter of strict contract interpretation, USDA did not fulfill the Settlement Agreement in getting an Adjunct Professor title for Ms. Kriesch.

The argument over the Plant Protection Center is a closer question.   The introductory portion of paragraph three of the Settlement Agreement provided that Ms. Kriesch would be "responsible for *supporting USDA interests* in the University of Maryland College of Agriculture and Natural Resources, Plant Protection Center, and related programs" (emphasis added).  *See also* 2009 IPA Agreement at 2 (describing "purpose" of APHIS Liaison position as "supporting USDA interests at the UM College of Agriculture and Natural Resources, Plant Protection Center"); *id.* at 2 (describing position as including "facilitat[ing] ongoing initiatives and further expand[ing] opportunities related to . . . integrating the Plant Protection Center with Federal, State and inter- and intra-university programs").  The parties dispute how the Court should interpret this provision.  Under Ms. Kriesch's proffered reading, USDA was obligated to

26

create and fund a Plant Protection Center.  *E.g.*, Reply at 7–9.[11]  USDA asserts that actualization

of a Plant Protection Center was only one of many of Ms. Kriesch's responsibilities at the

University.  *E.g.*, Opp. at 13.

The language concerning a Plant Protection Center came from the MOU between

USDA and the University of Maryland and was incorporated into the Settlement Agreement.

Concepts changed, however, and the University of Maryland ultimately proposed a Center for

Plant Health and Biosecurity, developed during Ms. Kriesch's detail to the University.  *See* Opp.,

Ex. 2 at 2 (noting Ms. Kriesch had "collaborated with Dr. Bill Kenworthy and AGNR

representatives in establishing the Center for Plant Health and Biosecurity.");  *accord* Watson

Decl., Ex. 2 (Nov. 29, 2011 email from Ms. Kriesch stating, "The Center they approved, the

Center for Plant Health and Biosecurity, calls for leadership from a PHD – which is beyond me –

but, I expect it will all get worked out.").  In such a changing scenario, Ms. Kriesch's

applications for funding a Plant Protection Center, assuming such applications were submitted to

USDA, could well have fallen on deaf ears: no funding was forthcoming, and no Plant Protection

Center was established.  Given the specificity of reference by USDA to a Plant Protection Center

in the Settlement Agreement, and its replacement by the University of Maryland with a proposal

for a Center for Plant Health and Biosecurity, the terms of the settlement were not satisfied.

### 2.  Materiality of Breach

The next question becomes whether either instance of breach, or both considered

together, constituted a material breach of the Settlement Agreement.  Considering all of the

---

[11] On some occasions, Ms. Kriesch has alluded that USDA fraudulently misled her to believe
that the Plant Protection Center existed prior to execution of the Settlement Agreement.  She
admits elsewhere, including in her sworn affidavit, that she was operating under no such
misunderstanding.  *See* Kriesch Aff. ¶ 9 (referring to "bring[ing] the PPC *to fruition*" (emphasis
added); *see also, e.g.*, Pl. Mot., Ex. 5 at 3 (Ms. Kriesch's assertion that the University "never
agreed *to the concept* in the first place" (emphasis added)).

relevant factors, the Court finds that there was no material breach of the Settlement Agreement. *See Cuneo*, 669 F. Supp. 2d at 109 (listing factors); *America I*, 468 F. Supp. 2d at 125 (same); *Greyhound*, 595 F. Supp. at 1224 (same).  As indicated, Ms. Kriesch does not assert that USDA breached the Settlement Agreement in any way other than the conditions under which she worked during her detail at the University of Maryland.  Neither breach "relate[d] to a matter of vital importance" or "[went] to the essence" of the contract.  *See America II*, 714 F. Supp. 2d at 100.  Most importantly, the Court cannot conclude that Ms. Kriesch was "deprived of the benefit [that] [she] reasonably expected under the contract."  *America I*, 468 F. Supp. 2d at 125.

### i.  Title Issue

USDA promised in the Settlement Agreement that Ms. Kriesch would be an Adjunct Professor at the University of Maryland.  When she arrived at the University, however, she discovered that the promised title was reserved for persons with terminal degrees in their fields (normally, a PhD), which, admittedly, she does not possess.  Therefore, she was never titled Adjunct Professor as the Settlement Agreement had specified.  Despite this apparent breach, other terms of the Settlement Agreement demonstrate that the absence of the title was not material to the settlement.

Without regard to what USDA promised regarding the title of Adjunct Professor, the Settlement Agreement was clear that Ms. Kriesch's work at the University of Maryland would be governed by University policies insofar as not inconsistent with federal requirements. At paragraph 3(b), the Settlement Agreement specified that the "tour of duty as APHIS Liaison [would] be governed by the MOU" between USDA and the University of Maryland; at pages 3–4, the MOU provided that "UM shall have the right to assess the qualifications and suitability of any APHIS employee nominated to serve as the APHIS Liaison" and that "appropriate UM policies and procedures governing liaison appointments may apply to the extent that they do not

conflict with appropriate Federal rules."  Ms. Kriesch does not dispute that the University had an inflexible policy that persons appointed as Adjunct Faculty were required to have terminal degrees; that she does not have such a qualifying degree; or that USDA had any control over University policies.  Her argument is that USDA should have known at the outset that its promise of an Adjunct Professor title was impossible to perform and that the lack of the title, available to her already at the American University, was a material breach.

The only way to read the Settlement Agreement is that USDA said that Ms. Kriesch would be an Adjunct Professor but that all University of Maryland policies and procedures would ultimately control.  Ms. Kriesch proposed a liaison position as Adjunct Professor at American University, where she was already so recognized, but USDA already had a working relationship with the University of Maryland since 2006 and preferred that location for her detail.  Kriesch Decl. ¶¶ 6–7.  The record provides no basis to find that USDA acted in bad faith when it agreed that Ms. Kriesch could carry the Adjunct Professor title to the University of Maryland, *if* appropriate University policies did not preclude it.  *See Cuneo*, 669 F. Supp. 2d at 109 (holding that, in determining whether a breach was willful, courts should consider "the extent to which the behavior of the defendant comports with standards of good faith and fair dealing" and "whether the breach was willful rather than by negligence or by extraneous circumstances" (internal citations and quotation marks omitted)).  Presumably, Ms. Kriesch anticipated that the University of Maryland would follow the practices of American University.  But the University of Maryland does not, and Ms. Kriesch had agreed that her detail would be performed within the constraints of "appropriate UM policies and procedures governing liaison appointments."  *See* MOU at 3–4.  Her inability to obtain the title of Adjunct Professor was one such constraint, and it does not equate to a material breach.  *See Cuneo*, 669 F. Supp. 2d at 109

(listing whether "extraneous circumstances" caused a breach as a factor relevant to the materiality inquiry).

Indeed, Ms. Kriesch offers no real argument that the difference in title between Lecturer and Adjunct Professor had any material impact on her detail to the University of Maryland. *See America I*, 468 F. Supp. 2d at 125 (listing "the extent to which the plaintiff can be adequately compensated for the part of that benefit of which he will be deprived" as a relevant factor for the materiality inquiry). She only states conclusorily that the title of Lecturer was less desirable. *See* Reply at 4-7; Aff. Penny Kriesch, Reply Ex. 1 [Dkt. 67-1] ¶¶ 5-8 ("A Lecturer is a step backwards for me, to which I would not voluntarily agree."). While the academic world distinguishes such titles, when it does on the basis of degree—a degree Ms. Krieger does not have—she cannot complain that the University of Maryland should have given her the title. In fact, she does not: she argues instead that USDA should have negotiated a liaison position for her at American University once it discovered after her detail commenced that she could not hold the promised position. The Settlement Agreement did not require such a step and, since Ms. Kriesch was fully compensated regardless of title and was listed as one of the "Affiliates, Adjuncts, and Lecturers" at the University of Maryland as consistent with the University's policies, *see* Def. Mot, Ex. 1 at 1–3, she has not shown any specific harm from the title snafu.

Finally, the Court must address the structure of the Settlement Agreement in determining whether the title of Adjunct Professor went to the essence of the contract. Under the settlement, both USDA and the University of Maryland could terminate the liaison position "for any reason" and at any time prior to August 31, 2012. Settlement Agreement ¶ 3(g). Only those parties retained the right to cancel the detail; if it were cancelled by either USDA or the University of Maryland, Ms. Kriesch would "be reassigned to USDA at the GS-15 level with

GS-15 duties to a Washington, D.C. metropolitan area or Maryland location of the Agency's

choosing, up until August 31, 2012." *Id.* ¶ 3(g). As with most employment assignments, Ms.

Kriesch did not retain the right to discard the detail. The language is clear and unambiguous, and

Ms. Kriesch does not argue otherwise. Therefore, either USDA or the University could have

terminated her detail at any time, and she would have been obligated to work for USDA for the

balance of the three-year period with no professorial title, no connection to the University, and

no teaching responsibilities. Ms. Kriesch agreed to settlement terms that left her University

position totally dependent on the continued assent of USDA and the University of Maryland, and

both of those entities reserved the exclusive right to terminate the detail. Under such

circumstances, and for this reason as well, the precise title of Ms. Kriesch's position was not

material to contract compliance. *See Greyhound*, 595 F. Supp. at 1226.

### ii.  Plant Protection Center

For similar reasons, the fact that no "Plant Protection Center" ever came into

existence at the University of Maryland did not constitute a material breach of the contract.

First, as discussed above, the Plant Protection Center was not a "matter of vital importance" to

the Settlement Agreement. *See America II*, 714 F. Supp. 2d at 100. Instead, the agreement was

focused on Ms. Kriesch's continued employment at a GS-15 step 6 level for approximately three

years at a place away from her prior work location. Although the detail to the University of

Maryland figured prominently, the Settlement Agreement clearly provided that USDA and the

University both held an irrevocable option to terminate the detail without notice and for any

reason at any time. Within these terms, as indicated above, the establishment of a specific

program at the University was not a material part of the parties' bargain to settle this lawsuit.

The documentation also indicates that Ms. Kriesch's obligations regarding the

Plant Protection Center were only a marginal part of her anticipated duties at the University

under the Settlement Agreement, which provided generally that she would be "responsible for

supporting USDA interests in the University of Maryland College of Agriculture and Natural

Resources, Plant Protection Center, and related programs."  Settlement Agreement ¶ 3; *accord*

2009 IPA Agreement Position Statement at 2.  The Position Description in the 2009 IPA

Agreement, however, evidences a minor role for the Plant Protection Center, which was listed

last among other duties:

> [S]tudent recruitment, retention, education and development; plant
> pest identification and related systematics studies; agricultural and
> environmental extension; implementing field programs;
> performing program monitoring, risk forecasting, and economic
> analyses; establishing linkages among various entities; facilitating
> the transfer of technologies between the UM, [Plant Protection and
> Quarantine], industry, and others; leveraging resources from
> diverse sources for plant pest management; international
> cooperation and development; and integrating the Plant Protection
> Center with Federal, State and inter- and intra-university programs.

2009 IPA Agreement at 2.  Under any reasonable reading of the Settlement Agreement and

incorporated documents, the specific list of duties trumps the general goal statements about the

Plant Protection Center.  *See In re Greenspan*, 910 A.2d 324, 340 (D.C. 2006) ("Under the

doctrines of *noscitur a sociis* and *ejusdem generis*, 'the meaning of a word is or may be known

from the accompanying words so that, under the rules, general and specific words, capable of

analogous meaning, when associated together, take color from each other, so that general words

are restricted to a sense analogous to less general.' (quoting *District of Columbia v. Estate of

Parsons*, 590 A.2d 133, 137 n.5 (D.C.1991))).

In addition, the documentation reflects that cooperation between USDA and the

University, facilitated by Ms. Kriesch, did lead to development of a program similar in concept

to the Plant Protection Center, called the Center for Plant Health and Biosecurity.  *See* Pl. Mot.,

Ex. 5 at 3 ("[T]hey created (with my facilitation) via formal University Charter, a Center for

Plant Health and Biosecurity.").  That notwithstanding, USDA tried to work with Ms. Kriesch to address her concerns about the non-existence of the Plant Protection Center, offering to "update the IPA" so that she would perform all the same functions "with the exception of 'Integration of the Plant Protection Center with Federal, State, and inter and intra university programs.'"  First Letter of Instruction at 30–33.  This offer was met with incommensurate allegations of bad faith and racial abuse, as was the case with many olive branches extended by USDA.  *See, e.g.*, Pl. Mot., Ex. 4 at 14 (February 2, 2012 e-mail from Ms. Kriesch stating: "I believe race-based retention is your personal and organizational intent.").  The record demonstrates that USDA demonstrated good faith and a great deal of patience in attempting to do what it could to assuage the concerns raised by Ms. Kriesch.  *See Wright v. Howard Univ.*, __ A.3d __, 2013 WL 530426, at *4 (D.C. Feb. 14, 2013) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."  (internal citation and quotation marks omitted)).

### 3.  Conclusion

Having carefully considered the Settlement Agreement and Ms. Kriesch's motion to enforce it, the Court concludes that there is no breach that "relates to a matter of vital importance or [that] goes to the essence [of the contract] and frustrates substantially the purpose for which the contract was agreed to by the injured party."  *See America II*, 714 F. Supp. 2d at 100.  As Ms. Kriesch herself acknowledges, the purpose of the contract was to agree to "a *quid pro quo*: APHIS would provide [her] with an IPA, under which [she] would work outside the Agency, and in exchange [she] would agree to leave APHIS in 3 years when the IPA concluded, i.e., on August 31, 2012."  Kriesch Aff. ¶ 4.  She has received the benefits for which she bargained, and USDA does not owe her anything else.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny Ms. Kriesch's Motion to Enforce

the Settlement Agreement, Dkt. 63.  A memorializing Order accompanies this Opinion.

DATE: March 22, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
